FILED by _____ KS _____ D.C.

Feb 24, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. **22-80022-CR-CANNON/REINHART**
_____

**18 U.S.C. § 1349**
**18 U.S.C. § 1347**
**18 U.S.C. § 371**
**42 U.S.C. § 1320a-7b**
**18 U.S.C. § 1956(h)**
**18 U.S.C. § 1956(a)(1)(B)(i)**
**18 U.S.C. § 1957(a)**
**18 U.S.C. § 2**
**18 U.S.C. § 981(a)(1)(C)**
**18 U.S.C. § 982(a)(1), (a)(7)**

**UNITED STATES OF AMERICA**

**vs.**

**DANIEL M. CARVER,**
**THOMAS DOUGHERTY,**
**JOHN PAUL GOSNEY JR.,**
**GALINA ROZENBERG,**
        **a/k/a "Galina Svenchenko,"**
**MICHAEL ROZENBERG,**
**LOUIS CARVER,**
**TIMOTHY RICHARDSON,**
**ETHAN MACIER,**
**ASHLEY CIGARROA, and**
**JOSE GOYOS,**

        **Defendants.**
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

## The Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations.   The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare.   Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered, among others, health services provided by hospitals, skilled nursing facilities, hospices, durable medical equipment ("DME") companies, and home health agencies.  Medicare "Part B" covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.      Medicare "providers" included independent clinical laboratories, physicians, DME companies, and other health care providers who provided items services to beneficiaries.  To bill Medicare, a provider was required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare.   The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare.  Specifically, the Provider Enrollment Application required the provider to certify,

2

among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5.     A Medicare "provider number" was assigned to a provider upon approval of the provider's Medicare Enrollment Application.  A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

6.     A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").  The claim form could be submitted in hard copy or electronically.

7.     When submitting claims to Medicare for reimbursement, providers were required to certify that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services that were purportedly provided, as set forth in the claims, were medically necessary.

8.     Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

9.      When initially enrolling or updating ownership or management information, the Provider Enrollment Application required the provider to disclose all owners and any individuals or businesses with managing control over the provider.  This disclosure obligation included any individual or entity with 5 percent or more ownership, managing control, or a partnership interest, regardless of the percentage of ownership the partner has.

10.     This disclosure obligation was necessary, in part, because, under 42 C.F.R. § 424.530, CMS could deny a provider's enrollment in the Medicare program if, among other reasons, the "provider, supplier, or any owner or managing employee of the provider or supplier was, within the preceding 10 years, convicted . . . of a Federal or State felony offense that CMS determines is detrimental to the best interests of the Medicare program and its beneficiaries."

## Part B Coverage and Regulations

11.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

12.     Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary.  For this to occur, the beneficiary would assign the right of payment to the health care provider.  Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## Medicare Coverage for Genetic Testing

13.     Cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx testing was not a method of diagnosing whether an individual presently had cancer.

14.     Cardiovascular genetic testing ("cardio testing" or "cardio tests") used DNA sequencing to detect mutations in genes that can indicate an increased risk of developing serious cardiovascular conditions in the future and can assist in the treatment or management of a patient who presently has signs or symptoms of a cardiovascular disease or condition.  Cardio testing was not a method of diagnosing whether an individual presently had a cardiac condition.

15.     For both CGx and cardio tests, the patient provided a saliva sample or cheek or nasal swab containing DNA material.  Tests were then run on different "panels" of genes.  Genetic testing typically involved multiple lab procedures that resulted in billing Medicare using certain billing codes, each with its own reimbursement rate.

16.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."   42 C.F.R.  § 411.15(a)(1).   Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

17.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional

requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

18.     Because neither CGx nor cardio testing diagnosed diseases or conditions (such as cancer or cardiovascular diseases), Medicare only covered such tests in limited circumstances. For CGx testing, such limited circumstances included when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

19.     For cardio testing, such limited circumstance included when a beneficiary experienced sudden cardiac death, was revived, and the sudden cardiac death resulted from a genetic anomaly. In this rare occurrence, Medicare may have covered cardio testing for immediate first-degree family members of the surviving patient to screen for genetic mutations. Medicare did not pay for cardio tests merely because a patient had hypertension or a history of cardiovascular conditions.

## Shell Lab Rule

20.     Title 42, United States Code, Section 13951(h)(5) provided that payment from Medicare for covered clinical diagnostic laboratory tests may only be made to "the person or entity which performed or supervised the performance of such test." If a test was "performed at the request of a laboratory by another laboratory," the referring laboratory could only be paid by

Medicare for that test if "not more than 30 percent of the clinical diagnostic laboratory tests for which such referring laboratory . . . receives requests for testing during the year in which the test is performed, are performed by another laboratory." *Id.* This was commonly called the "shell lab rule," as it, in essence, precluded pass-through billing arrangements where a lab bills Medicare for more than 30 percent of the tests that were actually performed by another lab.

### Durable Medical Equipment

21.     DME was reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

22.     A claim for DME submitted to Medicare qualified for reimbursement only if the DME was medically necessary for the treatment of the beneficiary's illness or injury, ordered by a licensed provider, and actually provided to the beneficiary.

### Telemedicine

23.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

24.     Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers.  Telemedicine companies typically paid doctors a fee to conduct consultations with patients.   In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

25.     Medicare Part B covered expenses for specific telehealth services if certain requirements were met.  These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and

video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner. In or around March 2020, in response to the COVID-19 pandemic, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

### The Defendants, Related Entities, and Relevant Persons

26.     Broad Street Lifestyles, LLC ("BROAD STREET") was a limited liability company formed under the laws of Florida, with a principal place of business in Palm Beach County, Florida. BROAD STREET held an account at JPMorgan Chase Bank ("JPMC") ending in x1906 ("Broad Street Account 1") and an account at TD Bank ending in x6973 ("Broad Street Account 2").

27.     Alpha Medical Supply, LLC ("ALPHA") was a limited liability company formed under the laws of Florida, with a principal place of business in Palm Beach County, Florida. ALPHA was a medical supply company enrolled with Medicare that purportedly provided DME to individuals, including Medicare beneficiaries. ALPHA held an account at Wells Fargo Bank ("Wells Fargo") ending in x9651 ("Alpha Account").

28.     Horizon Medical Supply ("HORIZON") was a limited liability company formed under the laws of Florida, with a principal place of business in Palm Beach County, Florida. HORIZON was a medical supply company enrolled with Medicare that purportedly provided DME to individuals, including Medicare beneficiaries. HORIZON held an account at Bank of America ("BOA") ending in x4079 ("Horizon Account").

29.     Cergena Laboratories, LLC ("CERGENA") was a limited liability company formed under the laws of Delaware, with a principal place of business in Orleans Parish, Louisiana. CERGENA was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services to individuals, including Medicare beneficiaries.  CERGENA held an account at JPMC ending in x0879 ("Cergena Account").

30.     Progenix Lab, LLC ("PROGENIX") was a limited liability company formed under the laws of Delaware, with a principal place of business in Miami-Dade County, Florida. PROGENIX was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services to individuals, including Medicare beneficiaries.  PROGENIX held an account at SunTrust Bank ending in x6648 ("Progenix Account").

31.     TheraGene Diagnostics, LLC ("THERAGENE") was a limited liability company formed under the laws of Wyoming, with a principal place of business in Montgomery County, Texas.   THERAGENE was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services to individuals, including Medicare beneficiaries. THERAGENE held an account at BOA ending in x0289 ("Theragene Account").

32.     Olympus First Consulting, LLC ("OLYMPUS") was a limited liability company formed under the laws of Florida, with a principal place of business in Palm Beach County, Florida. OLYMPUS held an account at JPMC ending in x6730 ("Olympus Account").

33.     DMC Group Holding, LLC ("DMC GROUP") was a limited liability company formed under the laws of Florida, with a principal place of business in Palm Beach County, Florida. DMC GROUP held an account at SunTrust Bank ending in x6697 ("DMC Group Account").

34.     MDA Consumers, Inc. ("MDA CONSUMERS") was a corporation formed under the laws of Florida, with a principal place of business in Palm Beach County, Florida.  MDA

CONSUMERS held an account at SunTrust Bank ending in x8815 ("MDA Consumers Account").

35.     MC Mission, Inc. ("MC MISSION") was a corporation formed under the laws of Florida, with a principal place of business in Palm Beach County, Florida. MC MISSION held an account at Wells Fargo ending in x9746 ("MC Mission Account").

36.     Metropolis Unlimited, LLC ("METROPOLIS") was a limited liability company formed under the laws of Florida, with a principal place of business in Broward County, Florida. METROPOLIS held an account at Wells Fargo ending in x2130 ("Metropolis Account 1") and an account at Valley National Bank ending in x5348 ("Metropolis Account 2").

37.     Company A was a limited liability company formed under the laws of Florida, with a principal place of business in Broward County, Florida. Company A held an account at BOA ending in x3693 ("Company A Account").

38.     Company B was a limited liability company formed under the laws of Colorado, with a principal place of business in Colorado. Company B owned or controlled Laboratory 1— an independent clinical laboratory enrolled with Medicare—and held an account at BOK Financial ending in x6733 ("Company B Account").

39.     Defendant **DANIEL M. CARVER** was a resident of Palm Beach County, Florida. **D-CARVER** was a beneficial owner of BROAD STREET, CERGENA, PROGENIX, THERAGENE, OLYMPUS, DMC GROUP, and MDA CONSUMERS, and he was a signatory on Broad Street Account 2, Olympus Account, DMC Group Account, and MDA Consumers Account.

40.     Defendant **THOMAS DOUGHERTY** was a resident of Palm Beach County, Florida. **DOUGHERTY** was a beneficial owner of BROAD STREET, CERGENA, PROGENIX, THERAGENE, OLYMPUS, DMC GROUP, and MC MISSION, and he was a signatory on Broad

Street Account 1, Broad Street Account 2, DMC Group Account, and MC Mission Account.

41.     Defendant **JOHN PAUL GOSNEY JR.** was a resident of Palm Beach County, Florida.  **GOSNEY** was a beneficial owner of CERGENA, PROGENIX, THERAGENE, OLYMPUS, DMC GROUP, and METROPOLIS, and he was a signatory on Metropolis Account 1 and Metropolis Account 2.

42.     Defendant **GALINA ROZENBERG** was a resident of Broward County, Florida. **G-ROZENBERG** was an owner of PROGENIX and DMC GROUP, and she was a signatory on Progenix Account and DMC Group Account.

43.     Defendant **MICHAEL ROZENBERG** was a resident of Broward County, Florida. **M-ROZENBERG** was a beneficial owner of PROGENIX and DMC GROUP.

44.     Defendant **LOUIS CARVER** was a resident of Palm Beach County, Florida.  **L-CARVER** was the listed owner of CERGENA, and he was the sole signatory on Cergena Account.

45.     Defendant **TIMOTHY RICHARDSON** was a resident of Palm Beach County, Florida.

46.     Defendant **ETHAN MACIER** was a resident of Palm Beach County, Florida. **MACIER** was a beneficial owner of THERAGENE, and he was a signatory on the Theragene Account.

47.     Defendant **ASHLEY CIGARROA** was a resident of Palm Beach County, Florida.

48.     Defendant **JOSE GOYOS** was a resident of Palm Beach County, Florida.

49.     John Mamone was a resident of Broward County, Florida, and he was the beneficial owner of ALPHA and a signatory on the Alpha Account.

50.     Joseph Mamone was a resident of Broward County, Florida, and he was the beneficial owner of HORIZON, and a signatory on the Horizon Account.

51.     Individual 1 was a resident of Broward County, Florida, and he was the owner of Company A, and a signatory on the Company A Account.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around January 2020, and continuing through in or around July 2021, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**DANIEL M. CARVER,**
**THOMAS DOUGHERTY,**
**JOHN PAUL GOSNEY JR.,**
**GALINA ROZENBERG,**
**a/k/a "Galina Svenchenko,"**
**MICHAEL ROZENBERG,**
**LOUIS CARVER,**
**TIMOTHY RICHARDSON,**
**ETHAN MACIER,**
**ASHLEY CIGARROA, and**
**JOSE GOYOS,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, including with John Mamone and Joseph Mamone, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control

12

of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things:  (a) paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries and doctors' orders for DME and genetic testing, and other documentation necessary to submit claims to Medicare (collectively, "doctors' orders"), without regard to any medical necessity for the prescribed DME and genetic testing; (b) paying kickbacks and bribes to telemedicine companies in exchange for ordering and arranging for the ordering of DME and genetic tests for Medicare beneficiaries, without regard to the medical necessity of the prescribed genetic tests or whether the tests were eligible for Medicare reimbursement; (c) falsifying and causing the falsification of Medicare enrollment forms to conceal the beneficial ownership of, and managing control over, CERGENA, PROGENIX, and THERAGENE; (d) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare for either DME or genetic testing that was not medically necessary and not eligible for Medicare reimbursement; (e) concealing and causing the

concealment of the submission of false and fraudulent claims to Medicare; and (f) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

**<u>Manner and Means</u>**

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.     **DANIEL M. CARVER, THOMAS DOUGHERTY, TIMOTHY RICHARDSON**, and others agreed to refer Medicare beneficiaries and doctors' orders for DME and genetic testing to DME companies and laboratories in exchange for kickbacks and bribes, based on the volume or value of payments by Medicare to the DME companies and laboratories, and regardless of whether the DME or genetic testing was medically necessary for the Medicare beneficiaries.

5.     **DANIEL M. CARVER, THOMAS DOUGHERTY, TIMOTHY RICHARDSON**, and others negotiated the kickback and bribe arrangements with ALPHA and HORIZON, as well as with other DME companies and laboratories, and disguised the nature and source of these kickbacks and bribes by concealing such payments through sham contracts and otherwise making such payments look like they were for legitimate services.

6.     **DANIEL M. CARVER, THOMAS DOUGHERTY, TIMOTHY RICHARDSON**, and others, through BROAD STREET, offered and paid kickbacks and bribes to co-conspirators, via interstate wire communication, including to telemedicine companies, in exchange for ordering and arranging for the ordering of DME and genetic testing for Medicare beneficiaries, without regard to the medical necessity of the prescribed DME or genetic testing, or whether the tests were eligible for Medicare reimbursement.

7.     **DANIEL M. CARVER, THOMAS DOUGHERTY, LOUIS CARVER, TIMOTHY RICHARDSON, JOSE GOYOS, ASHLEY CIGARROA**, and others altered, forged, or back dated doctors' orders, or caused such doctors' orders to be altered, forged or backdated, for DME and genetic testing.

8.     **DANIEL M. CARVER, THOMAS DOUGHERTY, LOUIS CARVER, TIMOTHY RICHARDSON, ETHAN MACIER, ASHLEY CIGARROA, JOSE GOYOS**, and others caused DME companies and laboratories to submit false and fraudulent claims to Medicare, via interstate wire communication, for DME and genetic testing that were: (a) induced through kickbacks and other illicit incentives; (b) not medically necessary; (c) not eligible for reimbursement; and (d) ordered by doctors who did not have a pre-existing doctor-patient relationship with the beneficiaries, were not treating the beneficiaries, did not conduct a physical examination, and did not conduct a proper telemedicine visit.

9.     **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR., GALINA ROZENBERG, MICHAEL ROZENBERG, ETHAN MACIER**, and others, acquired beneficial ownership interests of or managing control over laboratories, including CERGENA, PROGENIX, and THERAGENE.

10.     **GALINA ROZENBERG, LOUIS CARVER, ETHAN MACIER**, and others falsified and caused the falsification of Medicare enrollment forms, bank records, corporate records, and/or other documents to conceal **DANIEL M. CARVER's, THOMAS DOUGHERTY's, JOHN PAUL GOSNEY JR.'s**, and **MICHAEL ROZENBERG's** beneficial ownership of, and managing control over, CERGENA, PROGENIX, and THERAGENE.

11.     **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.**, and others, recruited and paid individuals, including **LOUIS CARVER**, to serve as nominee

owners of laboratories, including CERGENA, to conceal their beneficial ownership of or managing control over the laboratories.

12. **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.**, and others received kickbacks and bribes from independent clinical laboratories enrolled with Medicare, including but not limited to Laboratory 1, in exchange for referring Medicare beneficiaries and doctors' orders for genetic testing.

13. **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.**, Individual 1, and other co-conspirators negotiated kickback and bribe arrangements, and disguised the nature and source of these kickbacks and bribes by concealing such payments through sham contracts and otherwise making such kickbacks and bribes look like they were payments for legitimate services.

14. **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR., LOUIS CARVER, TIMOTHY RICHARDSON, ETHAN MACIER, ASHLEY CIGARROA, JOSE GOYOS**, and others submitted, and caused the submission of, false and fraudulent claims to Medicare, through the use of interstate wire communication, on behalf of CERGENA, totaling approximately $25,239,240, for laboratory services that were not medically necessary and not eligible for reimbursement.  As a result of these false and fraudulent claims, CERGENA received payments from Medicare in the approximate amount of $20,314,637.

15. **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR., GALINA ROZENBERG, MICHAEL ROZENBERG, TIMOTHY RICHARDSON, ETHAN MACIER, ASHELY CIGARROA, JOSE GOYOS**, and others submitted, and caused the submission of, false and fraudulent claims to Medicare, through the use of interstate wire communication, on behalf of PROGENIX, totaling approximately $32,784,312 for laboratory

services that were not medically necessary and not eligible for reimbursement.   As a result of these false and fraudulent claims, PROGENIX received payments from Medicare in the approximate amount of $25,633,128.

16.     **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR., TIMOTHY RICHARDSON, ETHAN MACIER, ASHLEY CIGARROA, JOSE GOYOS**, and others submitted, and caused the submission of, false and fraudulent claims to Medicare, through the use of interstate wire communication, on behalf of THERAGENE, totaling approximately $9,403,455, for laboratory services that were not medically necessary and not eligible for reimbursement.   As a result of these false and fraudulent claims, THERAGENE received payments from Medicare in the approximate amount of $7,106,502.

17.     **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR., GALINA ROZENBERG, MICHAEL ROZENBERG, LOUIS CARVER, TIMOTHY RICHARDSON, ETHAN MACIER, ASHLEY CIGARROA, JOSE GOYOS**, and others used the fraud proceeds received from Medicare to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-6
### Health Care Fraud
### (18 U.S.C. § 1347)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around January 2020, and continuing through in or around July 2021, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**DANIEL M. CARVER,**
**THOMAS DOUGHERTY,**
**JOHN PAUL GOSNEY JR.,**
**GALINA ROZENBERG,**
**a/k/a "Galina Svenchenko,"**
**MICHAEL ROZENBERG,**
**LOUIS CARVER,**
**TIMOTHY RICHARDSON,**
**ETHAN MACIER,**
**ASHLEY CIGARROA, and**
**JOSE GOYOS,**

in connection with the delivery of and payment for health care benefits, items, and services, did

knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health

care benefit program affecting commerce, as defined in Title 18, United States Code, Section

24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses,

representations, and promises, money and property owned by, and under the custody and control

of, said healthcare benefit program.

## Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for the defendants and their accomplices

to unlawfully enrich themselves by, among other things:  (a) paying and receiving kickbacks and

bribes in exchange for the referral of Medicare beneficiaries and doctors' orders for DME and

genetic testing, and other documentation necessary to submit claims to Medicare (collectively,

"doctors' orders"), without regard to any medical necessity for the prescribed DME and genetic

testing; (b) paying kickbacks and bribes to telemedicine companies in exchange for ordering and

arranging for the ordering of DME and genetic tests for Medicare beneficiaries, without regard to

the medical necessity of the prescribed genetic tests or whether the tests were eligible for Medicare

reimbursement; (c) falsifying and causing the falsification of Medicare enrollment forms to

conceal the beneficial ownership of, and managing control over, CERGENA, PROGENIX, and

THERAGENE; (d) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare for either DME or genetic testing that was not medically necessary and not eligible for Medicare reimbursement; (e) concealing and causing the concealment of the submission of false and fraudulent claims to Medicare; and (f) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### The Scheme and Artifice

4.      The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### Acts in Execution or Attempted Execution
### of the Scheme and Artifice

5.      On or about the dates specified below as to each count, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants identified in each count did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program, in that the defendants identified in each count submitted and caused the submission of false and fraudulent claims, seeking the identified dollar amounts, and representing that such benefits, items, and services were medically necessary and eligible for Medicare reimbursement:

| Count | Defendants | Medicare Beneficiary | Approx. Date of Claim Submission | Claim No.; DME/Lab | Description of Claims; Total Approx. Amount Billed |
|---|---|---|---|---|---|
| 2 | D. CARVER, DOUGHERTY, L. CARVER, RICHARDSON, MACIER, CIGARROA, and GOYOS | B.T. | 5/11/2020 | 1201408006370-01 (ALPHA) | Ankle foot orthosis; $4,100 |

| Count | Defendants | Medicare Beneficiary | Approx. Date of Claim Submission | Claim No.; DME/Lab | Description of Claims; Total Approx. Amount Billed |
|---|---|---|---|---|---|
| 3 | D. CARVER, DOUGHERTY, L. CARVER, RICHARDSON, MACIER, CIGARROA, and GOYOS | L.J. | 5/26/2020 | 12015080072-8000 (HORIZON) | Lumbar-sacral orthosis; $4,870 |
| 4 | D. CARVER, DOUGHERTY, GOSNEY, L. CARVER, RICHARDSON, MACIER, CIGARROA, and GOYOS | D.V. | 12/30/2020 | 53112102137-4790 (CERGENA) | Other specified cardiac arrhythmias; $9,042 |
| 5 | D. CARVER, DOUGHERTY, GOSNEY, G. ROZENBERG, M. ROZENBERG, L. CARVER, RICHARDSON, MACIER, CIGARROA, and GOYOS | J.C. | 4/24/2021 | 45572111490-0027 (PROGENIX) | Cardiomyopathy, unspecified; $8,892 |
| 6 | D. CARVER, DOUGHERTY, GOSNEY, L. CARVER, RICHARDSON, MACIER, CIGARROA, and GOYOS | W.M. | 7/14/2021 | 45292119514-8070 (THERAGENE) | Other specified cardiac arrhythmias; $9,070 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 7
### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.      Paragraphs 1 through 41 and 49 through 51 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around January 2020, and continuing through in or around July 2021, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**DANIEL M. CARVER,**
**THOMAS DOUGHERTY, and**
**JOHN PAUL GOSNEY JR.,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, including with John Mamone, Joseph Mamone, and Individual 1, to commit offenses against the United States, that is:

a.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, to a person to induce such person to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good,

21

facility, service or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things:  (a) soliciting and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries and doctors' orders for braces to ALPHA, HORIZON, and other DME companies; (b) soliciting and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries and doctors' orders for genetic testing to laboratories; (c) offering and paying kickbacks and bribes to telemedicine companies in exchange for ordering and arranging for the ordering of DME and genetic tests for Medicare beneficiaries; (d) submitting and causing the submission claims to Medicare through ALPHA, HORIZON, and other DME companies for braces; (e) submitting and causing the submission claims to Medicare through laboratories for genetic testing; (f) concealing and causing the concealment of kickbacks and (g) diverting kickback proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.     **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.,** and others solicited and received kickbacks and bribes from DME companies and laboratories, in exchange for recruiting and referring Medicare beneficiaries and doctors' orders for DME and genetic testing, knowing that the DME companies and laboratories would bill Medicare for DME and genetic testing purportedly provided to the recruited beneficiaries.

5.    **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.,** and others negotiated the kickback and bribe arrangements with DME companies and laboratories, to include Laboratory 1, and disguised the nature and source of these kickbacks and bribes through sham contracts and otherwise concealing such kickbacks and bribes by describing them as payments for legitimate services, such as "handling customer service inquiries."

6.    **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.,** and others offered and paid kickbacks and bribes to telemedicine companies in exchange for the ordering and arranging for the ordering of DME and genetic testing for Medicare beneficiaries.

7.    **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.,** and others caused DME companies and laboratories to submit claims to Medicare for DME and genetic testing.

8.    **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR.,** and others used the kickback payments received from DME companies and laboratories to benefit themselves and others, and to further the conspiracy.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.    On or about January 15, 2020, **THOMAS DOUGHERTY** formed BROAD STREET, listing himself as the sole member of the company on documentation filed with the State of Florida.

2.    On or about February 12, 2020, **DANIEL M. CARVER** and **THOMAS DOUGHERTY** executed signature cards related to Broad Street Account 2.

3.      On or about February 28, 2020, **THOMAS DOUGHERTY** executed a Healthcare Marketing Agreement between BROAD STREET and ALPHA, which falsely represented that the parties agreed to a "flat-fee marketing agreement [that] does not contain any nexus between business generated and payment for services performed . . . ."  In reality, BROAD STREET supplied beneficiary referrals, including completed doctors' orders, for DME products to ALPHA in exchange for a payment for each completed doctors' order.

4.      On March 9, 2020, **THOMAS DOUGHERTY** executed a signature card related to Broad Street Account 1.

5.      On or about March 10, 2020, John Mamone transferred approximately $30,000 via wire transfer from the Alpha Account to Broad Street Account 1, which constituted a kickback payment for Medicare beneficiary referrals.

6.      On or about March 10, 2020, **THOMAS DOUGHERTY** transferred approximately $25,000, via wire transfer, from Broad Street Account 1 to a telemedicine company, which constituted a kickback payment for completed doctors' orders.

7.      On or about August 3, 2020, Company A transferred approximately $30,000, via wire transfer, from the Company A Account to Broad Street Account 1, which constituted a kickback payment for Medicare beneficiary referrals.

8.      On or about April 30, 2021, Company B transferred approximately $75,000, via wire transfer, from the Company B Account to the Company A Account, which constituted a kickback payment for Medicare beneficiary referrals.

9.      On or about May 4, 2021, Individual 1 transferred $26,000 from Company A Account to **THOMAS DOUGHERTY**, through MC Mission Account, which constituted a kickback payment for Medicare beneficiary referrals.

10.     On or about May 4, 2021, Individual 1 transferred $16,600 from Company A Account to **DANIEL M. CARVER**, through MDA Consumers Account, which constituted a kickback payment for Medicare beneficiary referrals.

11.     On or about May 4, 2021, Individual 1 transferred $16,600 from Company A Account to **JOHN PAUL GOSNEY Jr.**, through Metropolis Account 1, which constituted a kickback payment for Medicare beneficiary referrals.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 8–13
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.     Paragraphs 1 through 41 and 49 through 51 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates enumerated below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**DANIEL M. CARVER,**
**THOMAS DOUGHERTY, and**
**JOHN PAUL GOSNEY JR.,**

so identified in each count below, did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare:

| Count | Defendant(s) | Approx. Date of Kickback Payment | Approx. Amt. of Kickback Payment | Description of Kickback Payment |
|-------|--------------|----------------------------------|----------------------------------|--------------------------------|
| 8 | **D. CARVER and DOUGHERTY** | 4/10/2020 | $20,000 | Wire transfer from the Alpha Account to Broad Street Account 1 |

25

| Count | Defendant(s) | Approx. Date of Kickback Payment | Approx. Amt. of Kickback Payment | Description of Kickback Payment |
|---|---|---|---|---|
| 9 | D. CARVER and DOUGHERTY | 5/7/2020 | $42,000 | Wire transfer from the Horizon Account to Broad Street Account 1 |
| 10 | D. CARVER, DOUGHERTY, and GOSNEY | 4/30/2021 | $75,000 | Wire transfer from the Company B Account to the Company A Account |
| 11 | DOUGHERTY | 5/4/2021 | $26,000 | Wire transfer from the Company A Account to the MC Mission Account |
| 12 | D. CARVER | 5/4/2021 | $16,600 | Wire transfer from the Company A Account to the MDA Consumers Account |
| 13 | GOSNEY | 5/4/2021 | $16,600 | Wire transfer from the Company A Account to Metropolis Unlimited Account 1 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18,

United States Code, Section 2.

## COUNT 14
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.      Paragraphs 1 through 46 and 48 through 51 of the General Allegations section of

this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around January 2020, and continuing through in or around July 2021, in

Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**DANIEL M. CARVER,**
**THOMAS DOUGHERTY,**
**JOHN PAUL GOSNEY JR.,**
**GALINA ROZENBERG,**
**a/k/a "Galina Svenchenko,"**

26

**MICHAEL ROZENBERG,**
**LOUIS CARVER,**
**TIMOTHY RICHARDSON,**
**ETHAN MACIER, and**
**JOSE GOYOS,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly, combine, conspire, and agree with each other and with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Sections 1956 and 1957, that is,

a.      to knowingly conduct a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.      to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and receipt of kickbacks in connection with a Federal health care program, in violation of Title 42, United States Code, 1320a-7b(b)(1)(A).

All in violation of Title 18, United States Code, Section 1956(h).

**COUNTS 15–19**
**Money Laundering**
**(18 U.S.C. § 1956(a)(1)(B)(i))**

1.      Paragraphs 1 through 42, and 44 of the General Allegations section of this
Indictment are realleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates specified below as to each count, in Palm Beach County, in
the Southern District of Florida, and elsewhere, the defendants,

**DANIEL M. CARVER,**
**THOMAS DOUGHERTY,**
**JOHN PAUL GOSNEY JR.,**
**GALINA ROZENBERG,**
**a/k/a "Galina Svenchenko,"and**
**LOUIS CARVER,**

so identified in each count below, did knowingly conduct and attempt to conduct a financial
transaction affecting interstate and foreign commerce, which transaction involved the proceeds of
specified unlawful activity, knowing that the property involved in the financial transaction
represented the proceeds of some form of unlawful activity, knowing that the transaction was
designed in whole and in part to conceal and disguise the nature, the location, the source, the
ownership, and the control of the proceeds of specified unlawful activity, as set forth below:

| Count | Defendant(s) | Approx. Date of Transaction | Description of Financial Transaction |
|---|---|---|---|
| 15 | D. CARVER, DOUGHERTY, GOSNEY, and L. CARVER | 11/25/2020 | **LOUIS CARVER**, through the Cergena Account, transferred $233,014 to the Olympus Account |
| 16 | DOUGHERTY | 3/30/2021 | **THOMAS DOUGHERTY**, through the MC Mission Account, transferred $1,572,247 to a real estate trust account |
| 17 | D. CARVER, DOUGHERTY, GOSNEY, and G. ROZENBERG | 4/20/2021 | **GALINA ROZENBERG**, through the Progenix Account, transferred $2,700,000 to the DMC Group Account |

| Count | Defendant(s) | Approx. Date of Transaction | Description of Financial Transaction |
|---|---|---|---|
| 18 | D. CARVER | 5/5/2021 | DANIEL M. CARVER, though the MDA Consumers Account, transferred $301,049 to a real estate developer |
| 19 | GOSNEY | 7/14/2021 | JOHN PAUL GOSNEY, through Metropolis Account 1, transferred $2,000,000 to Metropolis Account 2 |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and receipt of kickbacks in connection with a Federal health care program, in violation of Title 42, United States Code, 1320a-7b(b)(1)(A).

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNTS 20–22
### Money Laundering
### (18 U.S.C. § 1957(a))

1.      Paragraphs 1 through 34, 39, and 45 through 46 of the General Allegations section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates specified below as to each count, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**DANIEL M. CARVER,**
**TIMOTHY RICHARDSON, and**
**ETHAN MACIER,**

as identified in each count below, did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, by, through, and to a financial institution, in criminally derived property of a value greater than $10,000, and such property having been derived from

specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity:

| Count | Defendant(s) | Approx. Date of Transaction | Description of Monetary Transaction |
|-------|--------------|------------------------------|--------------------------------------|
| 20 | D. CARVER | 11/20/2020 | Transfer of funds by Cashier's Check from the Olympus Account in the amount of $24,950 |
| 21 | D. CARVER and RICHARDSON | 11/20/2020 | Transfer of funds by Cashier's Check from the Olympus Account in the amount of $24,650 |
| 22 | D. CARVER and MACIER | 11/20/2020 | Transfer of funds by Cashier's Check from the Olympus Account in the amount of $24,685 |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and receipt of kickbacks in connection with a Federal health care program, in violation of Title 42, United States Code, 1320a-7b(b)(1)(A).

In violation of Title 18, United States Code, Sections 1957(a) and 2.

## FORFEITURE ALLEGATIONS

1.     The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which any of the defendants, **DANIEL M. CARVER, THOMAS DOUGHERTY, JOHN PAUL GOSNEY JR., GALINA ROZENBERG, MICHAEL ROZENBERG, LOUIS CARVER, TIMOTHY RICHARDSON, ETHAN MACIER, ASHLEY CIGARROA,** and **JOSE GOYOS**, have an interest.

2.     Upon conviction of a violation, or conspiracy to commit a violation, of Title 18, United States Code, Sections 1347, 1349, and/or Title 42, United States Code, Section 1320a-7b,

as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      Upon conviction of a conspiracy to commit a violation of Title 18, United States Code, Section 1343, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

4.      Upon conviction of a violation of Title 18, United States Code, Sections 1956 and/or 1957, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

5.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

      a. Approximately $2,097,355.55 seized from account number 1017091073 at Synovus Bank on or about February 9, 2022;

      b. Approximately $906,015.62 seized from account number 1000280136648 at SunTrust Bank on or about July 14, 2021;

      c. Approximately $12,965.07 seized from account number 1000280136697 SunTrust Bank on or about July 14, 2021;

      d. Approximately $2,150,108.87 seized from account number 3876163578 at JPMorgan Chase Bank on or about July 14, 2021;

      e. Real property located at 17840 Key Vista Way, Boca Raton, FL 33496, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

         Lot 32, Block C2, of Oaks at Boca Raton Plat Four, according to the Plat thereof recorded in Plat Book 99, Page 180, of the Public Records of Palm Beach County, Florida

Parcel Identification Number: 00-42-46-31-05-003-0320;

    f.   Real property located at 122 SW 12th Ave, Delray Beach, FL 33444, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

        Lot 18, Block 3, Atlantic Park Gardens, according to plat thereof recorded in Plat Book 14, page 56, of the public records of Palm Beach County, Florida

        Parcel Identification Number: 12-43-46-17-18-003-0180; and

    g.   Real property located at 126 SW 12th Ave., Delray Beach, FL 33444, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

        Lot 19, Block 3, Atlantic Park Gardens, according to plat thereof recorded in Plat Book 14, page 56, of the public records of Palm Beach County, Florida

        Parcel Identification Number: 12-43-46-17-18-003-0190.

6.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to the forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p). Such substitute property includes, but is not limited to, the following:

    a.   Real property located at 10162 NW 69 Manor, Parkland, Florida, 33076, including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,

Lot 33, Block B, Fox Ridge, according to the map or plat thereof, as recorded in Plat Book 157, Page(s) 8, of the Public Records of Broward County, Florida.

Parcel Identification Number: 484104042510.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON


_____
JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

JOSEPH S. BEEMSTERBOER, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

DUSTIN DAVIS, ACTING DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE


_____
PATRICK V. QUEENAN
REGINALD CUYLER JR.
TRIAL ATTORNEYS
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES OF AMERICA

v.

DANIEL M. CARVER, et al.,

_____ Defendants/

CASE NO._____

## CERTIFICATE OF TRIAL ATTORNEY*
**Superseding Case Information:**

New defendant(s)  ☐ Yes   ☐ No
Number of new defendants _____
Total number of counts _____

**Court Division:** (Select One)
☐ Miami   ☐ Key West   ☐ FTL
☑ WPB   ☐ FTP

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) **No** _____
   List language and/or dialect _____

4. This case will take __20__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

| | (Check only one) | | | (Check only one) | |
|---|---|---|---|---|---|
| I | 0 to 5 days | ☐ | Petty | | ☐ |
| II | 6 to 10 days | ☐ | Minor | | ☐ |
| III | 11 to 20 days | ☑ | Misdemeanor | | ☐ |
| IV | 21 to 60 days | ☐ | Felony | | ☑ |
| V | 61 days and over | ☐ | | | |

6. Has this case previously been filed in this District Court? (Yes or No) **No** _____
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **Yes** _____
   If yes: Magistrate Case No. **22-mj-02188-Damian**
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No** _____

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No** _____

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No** _____

_____
PATRICK J. QUEENAN
DOJ Trial Attorney
Court ID No.    A5502715

*Penalty Sheet(s) attached

REV 3/19/21

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### PENALTY SHEET

**Defendant's Name:**     **TIMOTHY RICHARDSON**

**Case No:** _____

Count #:   1

   Title 18, United States Code, Section 1349

   Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty:**     Twenty (20) years' imprisonment; three years supervised release; $100 SA;
A fine of up to two times the pecuniary gain from the offense.

Counts #:   2 – 6

   Title 18, United States Code, Section 1347

   Health Care Fraud

**\*Max Penalty:**     Ten years' imprisonment as to each count; three years supervised release;
$100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   14

   Title 18, United States Code, Section 1956(h)

   Conspiracy to Commit Money Laundering

**\*Max Penalty:**     Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value
of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised
release.

Count #:   21

   Title 18, United States Code, Section 1956(a)(1)(B)(i)

   Money Laundering

**\*Max Penalty:**     Ten (10) years' imprisonment as to each count; a fine of up to $500,000 or
twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years
of supervised release.
**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name:          ASHLEY CIGARROA

Case No: _____

Count #:   1

   Title 18, United States Code, Section 1349

   Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:     Twenty (20) years' imprisonment; three years supervised release; $100 SA;
A fine of up to two times the pecuniary gain from the offense.

Counts #:   2 – 6

   Title 18, United States Code, Section 1347

   Health Care Fraud

**\*Max Penalty**:     Ten (10) years' imprisonment as to each count; three years supervised
release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**      **JOSE GOYOS**

**Case No:** _____

Count #:   1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:     Twenty (20) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:   2 – 6

  Title 18, United States Code, Section 1347

  Health Care Fraud

**\*Max Penalty**:     Ten years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   14

  Title 18, United States Code, Section 1956(h)

  Conspiracy to Commit Money Laundering

**\*Max Penalty**:     Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**       **DANIEL M. CARVER** _____

**Case No:** _____

Count #:    1

   Title 18, United States Code, Section 1349 _____

   Conspiracy to Commit Health Care Fraud and Wire Fraud _____

**\*Max Penalty:**     Twenty (20) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:  2 – 6

   Title 18, United States Code, Section 1347 _____

   Health Care Fraud _____

**\*Max Penalty:**     Ten (10) years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:  7

   Title 18, United States Code, Section 371 _____

   Conspiracy to Pay and Receive Health Care Kickbacks _____

**\*Max Penalty:**     Five (5) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:  8, 9, 10, 12

   Title 42, United States Code, Section 1320a-7b(b)(1)(A) _____

   Receipt of Kickbacks in Connection with a Federal Health Care Program ____

**\*Max Penalty:**     Ten (10) years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

Defendant's Name:          **DANIEL M. CARVER**

Case No: _____

Count #:  14

   Title 18, United States Code, Section 1956(h)

   Conspiracy to Commit Money Laundering

**\*Max Penalty:**    Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

Counts #:  15, 17, 18

   Title 18, United States Code, Section 1956(a)(1)(B)(i)

   Money Laundering

**\*Max Penalty:**    Twenty (20) years' imprisonment as to each count; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

Counts #:   20 – 22

   Title 18, United States Code, Section 1957(a)

   Money Laundering

**\*Max Penalty:**    Ten (10) years' imprisonment as to each count; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**          **THOMAS DAUGHERTY**

**Case No:** _____

Count #:   1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:     Twenty (20) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:   2 – 6

  Title 18, United States Code, Section 1347

  Health Care Fraud

**\*Max Penalty**:     Ten (10) years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   7

  Title 18, United States Code, Section 371

  Conspiracy to Pay and Receive Health Care Kickbacks

**\*Max Penalty:**     Five (5) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:   8 – 11

  Title 42, United States Code, Section 1320a-7b(b)(1)(A)

  Receipt of Kickbacks in Connection with a Federal Health Care Program

**\*Max Penalty:**     Ten (10) years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**          **THOMAS DOUGHERTY**

**Case No:** _____

Count #:   14

   Title 18, United States Code, Section 1956(h)

   Conspiracy to Commit Money Laundering

**\*Max Penalty:**    Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

Counts #:   15, 16, 17

   Title 18, United States Code, Section 1956(a)(1)(B)(i)

   Money Laundering

**\*Max Penalty:**    Twenty (20) years' imprisonment as to each count; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   **JOHN PAUL GOSNEY, JR.**

**Case No:** _____

Count #:   1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty:**   Twenty (20) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:   4, 5, 6

Title 18, United States Code, Section 1347

Health Care Fraud

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   7

Title 18, United States Code, Section 371

Conspiracy to Pay and Receive Health Care Kickbacks

**\*Max Penalty:**   Five (5) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:   10, 13

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

Receipt of Kickbacks in Connection with a Federal Health Care Program

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**         **JOHN PAUL GOSNEY, JR.**

**Case No:** _____

Count #:   14

    Title 18, United States Code, Section 1956(h)

    Conspiracy to Commit Money Laundering

**\*Max Penalty:**   Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

Counts #:   15, 17, 19

    Title 18, United States Code, Section 1956(a)(1)(B)(i)

    Money Laundering

**\*Max Penalty:**      Twenty (20) years' imprisonment as to each count; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>**PENALTY SHEET**</u>

Defendant's Name:            <u>**MICHAEL ROZENBERG**</u>

Case No: _____

Count #:   1

   Title 18, United States Code, Section 1349

   Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:     Twenty (20) years' imprisonment; three years supervised release; $100 SA;
A fine of up to two times the pecuniary gain from the offense.

Count #:   5

   Title 18, United States Code, Section 1347

   Health Care Fraud

**\*Max Penalty**:     Ten years' imprisonment as to each count; three years supervised release;
$100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   14

   Title 18, United States Code, Section 1956(h)

   Conspiracy to Commit Money Laundering

\*Max Penalty:    Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value
of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised
release.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
<u>PENALTY SHEET</u>

**Defendant's Name:**   <u>GALINA ROZENBERG, a/k/a Galina Svenchenko</u>

**Case No:** _____

Count #:   1

<u>Title 18, United States Code, Section 1349</u>

<u>Conspiracy to Commit Health Care Fraud and Wire Fraud</u>

**\*Max Penalty:**   Twenty (20) years' imprisonment; three years supervised release; $100 SA;
A fine of up to two times the pecuniary gain from the offense.

Count #:   5

<u>Title 18, United States Code, Section 1347</u>

<u>Health Care Fraud</u>

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count; three years supervised
release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   14

<u>Title 18, United States Code, Section 1956(h)</u>

<u>Conspiracy to Commit Money Laundering</u>

**\*Max Penalty:**   Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value
of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised
release.

Count #:   17

<u>Title 18, United States Code, Section 1956(a)(1)(B)(i)</u>

<u>Money Laundering</u>

**\*Max Penalty:**   Twenty (20) years' imprisonment as to each count; a fine of up to $500,000
or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three
years of supervised release.
**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PENALTY SHEET**

Defendant's Name:  **LOUIS CARVER**

Case No: _____

Count #:   1

  Title 18, United States Code, Section 1349

  Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:   Twenty (20) years' imprisonment; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Counts #:   2 – 6

  Title 18, United States Code, Section 1347

  Health Care Fraud

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count; three years supervised release; $100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   14

  Title 18, United States Code, Section 1956(h)

  Conspiracy to Commit Money Laundering

**\*Max Penalty:**   Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.

Count #:   15

  Title 18, United States Code, Section 1956(a)(1)(B)(i)

  Money Laundering

**\*Max Penalty:**   Twenty (20) years' imprisonment as to each count; a fine of up to $500,000 or twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised release.
**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## PENALTY SHEET

**Defendant's Name:**            **ETHAN MACIER**

**Case No:** _____

Count #:   1

   Title 18, United States Code, Section 1349

   Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:      Twenty (20) years' imprisonment; three years supervised release; $100 SA;
A fine of up to two times the pecuniary gain from the offense.

Counts #:   2 – 6

   Title 18, United States Code, Section 1347

   Health Care Fraud

**\*Max Penalty**:      Ten years' imprisonment as to each count; three years supervised release;
$100 SA; A fine of up to two times the pecuniary gain from the offense.

Count #:   14

   Title 18, United States Code, Section 1956(h)

   Conspiracy to Commit Money Laundering

**\*Max Penalty:**      Twenty (20) years' imprisonment; a fine of up to $500,000 or twice the value
of the fine involved in the transaction, whichever is greater; $100 SA; three years of supervised
release.

Count #:   22

   Title 18, United States Code, Section 1956(a)(1)(B)(i)

   Money Laundering

**\*Max Penalty:**      Ten (10) years' imprisonment as to each count; a fine of up to $500,000 or
twice the value of the fine involved in the transaction, whichever is greater; $100 SA; three years
of supervised release.
**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**