**SEALED**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED BY ___KP___ D.C.
Mar 2, 2022
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

**CASE NO. 22-CR-80022-AMC**

**UNITED STATES OF AMERICA**

vs.                                                         **FILED *EX PARTE* AND UNDER SEAL**

**DANIEL M. CARVER, et al.,**

      **Defendants.**
_____/

**DECLARATION OF FBI SPECIAL AGENT MARCUS WILLIAMS**
**IN SUPPORT OF PROTECTIVE ORDER**

I, Marcus Williams, under penalty of perjury, declare:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this declaration in support of an *ex parte* application for the entry of a protective order for an asset subject to forfeiture in the above-captioned case. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Miami Division. I have been employed in this capacity for approximately two and one-half years. I am presently assigned to investigate a wide variety of health care fraud matters, including schemes to defraud Medicare and Medicaid. In this capacity, I am authorized to conduct investigations into criminal violations committed against the United States, including health care fraud, payment and receipt of illegal health care kickbacks, making false statements in connection with a health care benefit program, and related conspiracies. I am authorized to apply for and execute arrest warrants for offenses enumerated in Titles 18 and 42 of the United States Code, and to execute search warrants. Prior to my law enforcement career, I spent five years working in different leadership positions for Palm Beach County Public Schools. I received training in investigating various types of criminal activity, including fraud, at FBI

headquarters at Quantico, Virginia.

2. The facts in this declaration come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This declaration is intended to show that there is sufficient probable cause for the requested protective order and does not set forth all of my knowledge about this matter.

## ASSETS SUBJECT TO FORFEITURE

3. The property subject to forfeiture in the above-captioned case includes, but is not limited to, all funds on deposit in account number 42615348 at Valley Bank, held in the name of Metropolis Unlimited, LLC (the "Subject Asset").

## STATEMENT OF FACTS

4. There is probable cause to believe that over the last year, Defendants John Paul Gosney, Jr. ("Defendant Gosney") and others, along with marketing companies and laboratories he and his co-conspirators own, operate, or control, engaged in nationwide health care fraud and money laundering conspiracies. As part of their criminal scheme and conspiracies, telemarketers fraudulently obtained medical information from Medicare beneficiaries to refer over 6,000 false and fraudulent cardio tests to the co-conspirators' shell laboratories, which include Cergena Laboratories, LLC ("Cergena").

5. There is probable cause to believe that these laboratories, including Cergena, did not actually render clinical diagnostic services but instead referenced out the services to a separate laboratory that conducted the tests for a few hundred dollars. Defendant Gosney and his co-conspirators then unlawfully billed Medicare for over $7,000 for each test and kept the remaining reimbursement amount. From in or around November 2020 to July 2021, Cergena submitted approximately $25,239,240 in fraudulent claims to Medicare, and over $20 million in

reimbursements relating to those claims were paid. A significant portion of these fraud proceeds were transferred to and commingled among accounts held by or controlled by Defendant Gosney and his co-conspirators, including the Subject Account.

### A. Healthcare Fraud Scheme

6.  The Medicare Program ("Medicare") is a federally funded program that provides free and below-cost health care benefits to people aged 65 years or older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the Medicare Program. Medicare beneficiaries are eligible to receive a variety of services, including "Part B" covered outpatient physician services, including laboratory services, such as genetic testing, when certain criteria are met. Cardiovascular genetic testing ("cardio testing" or "cardio tests") is one type of genetic testing that may be covered by Part B.[1] Medicare reimburses for the cardio test at varying rates from a few hundred dollars to over $7,000 for a panel of tests.

7.  Congress statutorily excludes Medicare from covering diagnostic testing that is "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *See* 42 U.S.C. § 1395y(a)(1)(A). If testing is necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposes additional physician consultation and treatment requirements before covering the diagnostic testing. 42 C.F.R. § 410.32(a).[2] *Id.* Because cardio testing does not

---

[1] Cardio tests use DNA sequencing to detect mutations in genes that can indicate an increased risk of developing serious cardiovascular conditions in the future and can assist in the treatment or management of a patient who presently has signs or symptoms of a cardiovascular disease or condition. The tests are not a diagnostic tool to identify a cardiac condition in the first instance.

[2] Section 410.32(a) provides, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and

diagnose cardiovascular diseases or conditions, Medicare only covers such tests in limited circumstances.[3] Medicare does not pay for cardio tests merely because a patient had hypertension or a history of cardiovascular conditions.

8. From in or around December 2020 to at least July 2021, the Conspirators operated a call center out of 1200 North Federal Highway, Suite 417, Boca Raton, Florida (the "North Federal Call Center"), which is within the Southern District of Florida. The North Federal Call Center solicited Medicare beneficiaries and fraudulently obtained their information as part of the conspiracies.

9. During the investigation, federal agents spoke to North Federal Call Center employees. These employees told federal agents that they were instructed to contact Medicare beneficiaries and convince them under false pretenses to consent to medically unnecessary cardio tests and that employees could earn cash bonuses based on the number of "deals" they secured.

10. On or about June 17, 2021, federal agents spoke to CS-2[4], a former sales representative. CS-2 was not aware of the name of the company CS-2 worked for, but CS-2 provided federal agents a paystub that listed DMC Group Holding, LLC ("DMC Group") as the employer. According to records on file with the Florida Secretary of State, DMC Group's principal place of business is 1200 North Federal Highway, Suite 417, Boca Raton, Florida 33432, the same

---

who uses the results in the management of the beneficiary's specific medical problem." The section also states: "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

[3] Such limited circumstances include when a beneficiary experiences sudden cardiac death, is revived, and the sudden cardiac death is resultant of a genetic anomaly. In this rare occurrence, the immediate first-degree family members of the surviving patient may be candidates for cardio testing to screen for genetic mutations.

[4] Consistent with the affidavit submitted in support of the Criminal Complaint [ECF No. 1], the confidential source is referred to as CS-2 herein.

address as the North Federal Call Center.

11. Later, CS-2 produced North Federal Call Center documents that mentioned Gentec Solutions, LLC ("Gentec Solutions") as the entity that was contacting the beneficiaries. Gentec Solutions is a Florida limited liability company with the North Federal Call Center as its principal place of business, which like DMC Group, is located at 1200 North Federal Highway, Suite 417, Boca Raton, Florida 33432.

12. After interviewing in mid-April 2021, CS-2 told federal agents that CS-2 was hired in the sales department. According to CS-2, the sales department was responsible for calling Medicare beneficiaries and convincing them to agree to take a cardio test; the insurance verification department verified that the individuals the call center contacted actually had Medicare; and the transfer department transferred patients from one department to another.

13. CS-2 provided federal agents copies of two scripts her/his managers provided to her/him and explained that CS-2 and other employees were trained to lie to Medicare beneficiaries during the call if needed to close the "deal." Below are examples:

    i. - *Hello, this is _____ with the health and wellness center . . .* [CS-2 stated there was no health and wellness center];

    ii. - *. . . you and I spoke last year and we did a brief wellness check do you recall that?* [CS-2 explained this was a lie and because many of the beneficiaries were elderly, they would likely not remember either way];

    iii. - *. . . we do the wellness check annually so we are going to take care of that really quick today* [CS-2 explained the purpose of the call was not to conduct an annual wellness check but to induce the beneficiary to provide Medicare and health information and further induce them to consent to a cardio test];

    iv. - *. . . I have most of your information from last year* [CS-2 explained no one spoke to the beneficiary "last year;" instead, the NORTH FEDERAL CALL CENTER had purchased lists of Medicare beneficiaries that contained contact information and sometimes a Medicare insurance number];

    v. – *This is a preventive test provided as a benefit of your insurance.*

5

[As discussed above, unless the beneficiary meets the strict medical necessity requirements listed above, Medicare does not cover a cardio test for screening or "preventive" purposes].

14. CS-2 also said her/his managers instructed them to ask the beneficiary numerous questions that led the beneficiary to answer in the affirmative to justify ordering a cardio test.

15. CS-2 further explained there was a TV monitor on the sales floor broadcasting to the entire sales department the leaders for the day, week, and month. CS-2 explained that if a sales representative convinced three beneficiaries in a day to consent to a cardio test, that sales representative got a chance to spin a "cash wheel" to receive a cash bonus.

16. CS-2 explained that CS-2 was instructed to hang up on anyone that was not a Medicare recipient as they only wanted to sell to Medicare beneficiaries.

17. Typically, upon making the calls, CS-2 only had name and contact information for the beneficiary, although in a few instances the patient list included the Medicare insurance number. CS-2 explained that when she/he had the Medicare number it made the telemarketing call seem "more legit." When CS-2 did not have the Medicare number, CS-2 explained that she/he was instructed by her/his managers to lie to beneficiaries in order to convince the beneficiaries to provide their Medicare numbers, which was necessary for the laboratories to bill Medicare. CS-2 explained that she/he was instructed to tell beneficiaries that she/he had their Medicare number, but it was encrypted, and to move forward, the beneficiary needed to "confirm" the number.

18. CS-2 identified Defendant Gosney as one of the "top three guys". CS-2 explained that if there was an issue during a beneficiary call, one of the "top three guys" would take over as they were "smooth talkers". CS-2 identified Defendant Gosney as the daily floor manager.

19. CS-2 was not a licensed medical professional of any kind.

20. CS-2 confirmed that the North Federal Call Center had a doctor chase operation.

Independently, federal agents obtained copies of actual fax cover sheets sent to medical providers in furtherance of the doctor chase operation. These fax cover sheets were from "GENTEC SOLUTIONS," and falsely and deceptively referred to a beneficiary as "our mutual patient." For example, on or about June 2, 2021, agents interviewed Dr. W.S., who filed a complaint regarding Gentec Solutions and Cergena. In or around November 2020, she/he received a suspicious phone call from a company claiming to be contracted with Medicare and asking if Dr. W.S. was the doctor for C.C., a Medicare beneficiary. Dr. W.S. then called C.C., who informed her/him that C.C. received a call about a cardio test and C.C. provided the caller with her/his information because C.C. thought it was legitimate. Dr. W.S. stated that a cardio test would provide "nothing of value, especially for a 74-year-old."

21. Around this time, Dr. W.S. received two faxes from Gentec Solutions requesting Dr. W.S. sign a lab requisition form for C.C. to take a cardio test. The faxes included language regarding a "mutual patient." Dr. W.S. explained that the faxes contained pre-filled requisition forms for Cergena and requested a genetic test for a panel of genes. Dr. W.S. then received a number of calls from a "Nicole," who identified as a Gentec Solutions' representative following up on the requisition form. Dr. W.S. informed Nicole that what Gentec Solutions was doing is illegal and was later hung up on when speaking with a supervisor.

22. Dr. W.S., a solo medical practitioner in Oregon, explained that she/he never heard of Cergena, and if she/he needed to order any lab tests for patients, she/he would have used a local laboratory in Oregon, not Louisiana where Cergena was located.

23. Federal law limits the amount of testing that an independent clinical laboratory can bill Medicare for when it does not perform the test itself. Apart from two circumstances that do not apply here, a laboratory may not "reference out" more than 30% of its tests and still bill

Medicare for those tests. 42 U.S.C. § 1395I(h)(5)(A). This is known as the "Shell Lab Rule," as it prevents laboratories from acting as billing shells while performing little or no work themselves. Between August 2020 and December 2020, Cergena billed Medicare for over $25 million, of which Medicare paid over $20 million. These claims were connected to expensive cardio tests for over 2,800 beneficiaries. With the exception of one instance, Medicare claims data shows that essentially all of the claims were billed using a modifier indicating that, in violation of the shell lab rule, another laboratory, not Cergena, actually performed the test.

24. Based on my training and experience, when an independent clinical laboratory, such as Cergena, refers virtually all of their testing to an outside reference laboratory, there is probable cause to believe it is a shell laboratory used solely to submit claims to Medicare.

### B. Laundering of Fraud Proceeds into the Subject Account

25. More than $20 million of the Medicare reimbursements for claims for cardio testing submitted by Cergena were deposited into a JPMorgan Chase Bank account held by Cergena ("JPMorgan Account 0879").

26. Based on a review of financial records, between on or about June 24, 2020 and February 17, 2021, JPMorgan Account 0879 received a total of approximately $20,028,958.00. These funds were all proceeds from Medicare contractors tied to reimbursements for false and fraudulent claims Cergena submitted to Medicare. Claims submitted during the same time period were all related to cardio testing.

27. From this account, fraud proceeds were then laundered to the Subject Account through a series of accounts held and/or controlled by Defendants and their co-conspirators, in an effort to conceal the nature, location, source, ownership, or control of the proceeds.

28. From this account, between October 15, 2020 and February 8, 2021, approximately

$13,037,218.00 was transferred to another JPMorgan Chase Bank account held by Olympus First Consulting, LLC ("JPMorgan Account 6730"). Defendant Daniel Carver is the sole signatory on JPMorgan Account 6730.

29.     Between on or about October 19, 2020 and February 5, 2021, approximately $1,954,100.00 was transferred in a series of approximately 41 wire transfers from JPMorgan Account 6730 to a Wells Fargo account held by Metropolis Unlimited, LLC ("Wells Account 2130") as shown in the following table:

| Date (approx.) | Amount (approx.) | Description | Method |
|---|---|---|---|
| 10/19/2020 | $240,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 10/26/2020 | $200,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 11/2/2020 | $280,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 11/10/2020 | $60,000 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 11/16/2020 | $195,000 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 11/20/2020 | $110,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 11/25/2020 | $68,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 11/30/2020 | $110,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 12/8/2020 | $110,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 12/16/2020 | $100,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 12/23/2020 | $50,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 12/24/2020 | $25,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 1/11/2021 | $87,500.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 1/15/2021 | $70,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 1/20/2021 | $90,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |

| 1/22/2021 | $25,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 1/26/2021 | $48,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 1/27/2021 | $15,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 2/3/2021 | $12,600.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 2/3/2021 | $38,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| 2/5/2021 | $20,000.00 | SunTrust Account 6730 to Well Account 2130 | Wire Transfer |
| **TOTAL** | $1,954,100.00 | | |

30. Defendant Gosney was the sole signatory for Wells Account 2130. According to records on file with the Florida Secretary of State for Metropolis Unlimited, LLC, Defendant Gosney was listed as its sole member.

31. After receipt of these funds into Wells Account 2130, a portion of these fraud proceeds was then transferred to another account associated with the Defendant Gosney, the Subject Account.

32. On or about July 14, 2021, approximately $2,000,000.00 was transferred via wire transfer from Wells Account 2130 to the Subject Account.

33. As of on or about February 25, 2022, the Subject Account had a balance of over approximately $818,230.30.

34. On or about February 25, 2022, a bank representative confirmed that the balance of the Subject Account had not fallen below $0 between inception and February 25, 2022.

## **CONCLUSION**

35. Based on the foregoing, there is probable cause to believe that the Subject Asset is subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(7), as gross proceeds traceable to the commission of the health care fraud scheme and conspiracy in violation of 18 U.S.C. §§ 1347,

1349, and/or 42 U.S.C. 1320a-7b alleged in the Indictment; pursuant to 18 U.S.C. § 981(a)(1)(C), as proceeds of the conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 alleged in the Indictment; and pursuant to 18 U.S.C. § 982(a)(1), as property involved in the money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957 alleged in the Indictment, and/or as property traceable to such property.

Executed on March 2, 2022.

Respectfully submitted,

Marcus Williams, Special Agent
Federal Bureau of Investigation