**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-80022-CR-CANNON/REINHART**

**UNITED STATES OF AMERICA**

**v.**

**DANIEL M . CARVER,**
**THOMAS DOUGHERTY,**
**JOHN PAUL GOSNEY JR.,**
**LOUIS CARVER,**
**ETHAN MACIER,**
**ASHLEY CIGARROA, and**
**JOSE GOYOS,**

       **Defendants.**

_____/

**UNITED STATES' DISCLOSURE OF**
**ANTICIPATED EXPERT WITNESSES AND ADDITIONAL EVIDENCE**

      The United States, through undersigned counsel, hereby files this Disclosure of Anticipated Expert Witnesses and Additional Evidence, pursuant to the Standing Discovery Order entered in this case [D.E. 50], and Federal Rules of Evidence 702, 703, and 705.  Also, the United States hereby requests the disclosure of any experts the defense intends to call at trial, as well as such experts' qualifications and proposed opinions to be offered at trial.

      As the United States advised in its First Response to the Standing Discovery Order [D.E. 152], the United States intends to introduce expert testimony regarding the functioning of the Medicare Program, Medicare billing procedures and rules, Medicare auditing procedures and rules, Medicare cost reporting, rules relating to overpayment of clams, the medical necessity of certain genetic tests for which the defendants submitted and caused the submission of claims to Medicare, and telemedicine.  The United States' proposed experts, as well as additional evidence, is more fully described herein.

1

## NOTICE OF POTENTIAL EXPERT WITNESSES

### Medicare Witnesses

**Stephen Quindoza:**  The United States intends to call Stephen Quindoza, or another witness, to explain how Medicare works, Medicare's coverage for laboratory testing (including genetic testing and other testing conducted in this case), Medicare's coverage for durable medical equipment ("DME"), Medicare's coverage for telemedicine, the fact that Medicare does not cover claims based on kickbacks or bribes, and the representations that providers, including owners of laboratories and DME companies, must make to enroll with Medicare.[1]

Qualifications:  The United States has provided Mr. Quindoza's CV to the defense and transcripts of Mr. Quindoza's prior testimony.  In sum, Mr. Quindoza has worked for several Medicare contractors primarily in fraud investigations and public relations.  He is currently employed by SafeGuard Services LLC ("SGS") and supports the Southeast and Northeast Unified Program Integrity Contractors ("UPICs").  In his current role, Mr. Quindoza is responsible for support and education for federal law enforcement agencies, training and development of staff, outreach activities relating to fraud and abuse, and coordinating and sharing information with the Centers for Medicare and Medicaid Services ("CMS"), other contractors, and law enforcement agencies.  Mr. Quindoza has decades of experience working with Medicare contractors.  In

---

[1]     The United States outlines in detail the anticipated scope of Mr. Quindoza's background and qualifications, the topics he is expected to testify about, and opinions he is expected to render, which may include opinions on hypothetical situations.  Mr. Quindoza may offer some or all of the following testimony and opinions as described in this Notice.  This is not an exhaustive list of his testimony but a general (and detailed) outline, and the United States respectfully requests to add additional topics and observations during trial preparation.  The United States points out that Mr. Quindoza has testified previously in a case involving genetic testing (*United States v. Ivan Scott*, 19-cr-00209-PGB (M.D. Fla.), the transcripts of which have been provided to the defense, along with transcripts from many additional trials involving other Medicare-covered services.  As necessary, the United States will supplement this disclosure to identify any additional opinions or topics that Mr. Quindoza may cover.

addition, he has experience processing claims for payment to Medicare.  In the course of his many years in this industry, Mr. Quindoza has become familiar with Medicare's coverage for laboratory services and has overseen fraud investigations for Medicare contractors.  He is also familiar with analyzing voluminous claims data.  He has testified about Medicare and Medicare coverage dozens of times.  He has previously testified regarding Medicare's coverage for genetic testing services in *United States v. Ivan Scott*, 19-cr-00209-PGB (M.D. Fla.).  He has previously testified regarding Medicare's coverage for DME in *United States v. Hagen*, 19-cr-00146 (N.D. Tex.); *United States v. Murphy*, 20-cr-00291 (N.D. Ala.); *United States v. Beaufils*, 20-cr-00063 (S.D. Ga.); *United States v. Davis*, 18-cr-00077 (M.D. Tenn.); and *United States v. Pate*, 18-cr-00008 (S.D. Ga.).

Bases for Testimony:  Mr. Quindoza's opinions will be based on his knowledge, training, skill, and experience working with the Medicare program, including its rules and regulations, as well as his review and analysis of documents and claims data, which have been provided as discovery to the Defendant in this case.

Summary of Anticipated Testimony:  The United States anticipates that Mr. Quindoza's testimony may cover the following topics and include the following opinions:

### 1. Background on Medicare

- Mr. Quindoza will testify that Medicare is a federally funded program that provides below-cost health care benefits to people age 65 years or older, the blind, and the disabled.  The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the Medicare Program.  Mr. Quindoza will explain that individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital and physician services ("Part B").  Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, when certain criteria are met.

- Mr. Quindoza will explain what a claim for payment from Medicare is, and what must be included to submit a claim for payment from Medicare, including the following:  (1) the claim must pertain to a patient who was properly enrolled as a Medicare beneficiary; (2) the healthcare provider who furnished the services to the patient must be licensed in the state in which they practice and be properly enrolled with Medicare; (3) the services

claimed must have been actually provided as reported on the claim; (4) the services claimed must be medically necessary and eligible for reimbursement under any applicable rules, regulations, or policies; and (5) the claim must be properly reported and properly documented with a supporting medical record.

- Mr. Quindoza will testify to the claims adjudication process, including the time in which Medicare processes claims and the extent to which claims are, or are not, reviewed by Medicare. He will testify that it is a physical impossibility for every claim to be reviewed before it is paid by Medicare. Instead, Medicare relies on the provider's representation that claims are true and accurate.

### 2. Medicare Enrollment Process and Form 855

- Mr. Quindoza will explain that "Providers" include clinical laboratories, DME companies, physicians, and other health care providers who provide services to beneficiaries. In order to bill Medicare, a provider must submit an enrollment application to Medicare. The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare. Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

- Mr. Quindoza will explain the representations that providers make regarding their ownership and management structure.

- Mr. Quindoza will explain how Medicare relies on providers to be truthful in attesting to their obligations and making representations about ownership, management, and other matters in their enrollment paperwork.

- Mr. Quindoza will also explain what a Medicare "provider number" is. A provider number is assigned to a provider upon approval of the provider's Medicare application. A provider may use that provider number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries. When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

- Mr. Quindoza will discuss the Form 855s as well as other documentation submitted by the various clinical laboratories and DME company providers referenced in the Indictment, including representations contained within the forms as to providers' ownership, management, location(s), and promises made in those forms to comply with applicable rules and regulations and to not submit false claims.

### 3.   Medicare Audits

- Medicare (or its contractors) conducts audits if a healthcare provider or a patient questions how their claim was processed, or if Medicare identifies claims that may not be appropriately billed.  Medicare analyzes billing data to identify anomalies.

- Regardless of who initiates an audit, audits typically have several steps.  Medicare requests medical records that support the particular claim, such as doctors' orders and records from the supplier.  Once the documentation is received, Medicare may use licensed clinicians to review the records to determine whether the service was medically necessary for the diagnosis or treatment of the patient and whether the medical records support the code billed.

- Following an audit, corrective actions can be put in place.  One type of corrective action is an overpayment recovery where Medicare seeks repayment of what should not have been paid to the provider.  Another type of corrective action is educating the provider on what they should be doing.  A third type of corrective action is initiating an investigation of potential fraud.  Medicare can also suspend payments to a provider or place a provider on prepayment review.

- Providers can appeal Medicare's audit determinations.

### 4.   Medicare's Coverage for Telemedicine

- Telemedicine or telehealth is medical care delivered by electronic means.  Under Medicare rules and regulations applicable during the relevant time period of this case, the interaction between the patient and the doctor or other licensed provider was required to be in real-time and have both audio and visual communication.  Additionally, the patient who was receiving the care must have been residing in a rural health professional shortage area.  The patient must still go to an originating site, which is a doctor's office, hospital, or some other facility to receive the telehealth service.  These requirements were intended to expand access to care in rural areas where access to health care is more limited.  *See* 42 C.F.R. § 410.2; 42 C.F.R. § 410.78; 42 C.F.R. § 414.65.

  In March 2020, in response to the COVID-19 pandemic, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

### 5.   Shell Lab Rule

- Laboratories may only bill for testing they reference out to be conducted by other independent laboratories under the 70/30 rule (also known as the "shell lab rule"), which prohibits a referring lab from billing for "more than 30 percent of the clinical diagnostic laboratory tests" that are actually performed by another lab. See 42 U.S.C. § 1395l(h)(5).

- Mr. Quindoza will discuss letters submitted by providers referenced in the Indictment in this case to Medicare promising to comply with this rule.

**6. Medicare's Coverage for Laboratory Testing**

- Mr. Quindoza will testify that this case implicates claims submitted to Medicare for laboratory services, namely, genetic testing, including cancer genetic ("CGx") tests and cardiovascular genetic ("cardio") tests.

  Mr. Quindoza will explain Medicare's reimbursement policies with respect to such testing, and he will testify that Medicare reimburses for the test at rates varying from approximately a few hundred dollars to several thousand dollars for a panel of tests. Mr. Quindoza will explain that Medicare does not pay for every potential medical service, and instead, many services are expressly excluded from coverage.

- Mr. Quindoza will testify that as a condition of Medicare payment, a physician or other Medicare provider must certify that the services performed were medically necessary as required by Title 42, United States Code, Section 1395n(a)(2)(B).

- Mr. Quindoza will testify that Medicare generally does not pay for "screening" tests, unless specifically covered by statute, which the genetic tests billed in this case were not. Rather, lab testing must be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 C.F.R. § 411.15(a)(1); 42 C.F.R. § 410.10(e).

- Mr. Quindoza will explain that laboratory tests must also be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results of the test in the management of the beneficiary's specific medical problem. Mr. Quindoza will testify that Medicare does not cover genetic tests that are not ordered by the beneficiary's treating physician because CMS has determined that tests not ordered by the physician treating the beneficiary are not reasonable and necessary. *See* Title 42, Code of Federal Regulations, Section 410.32(a).

- Certain screening tests are exempted from the general exclusion from coverage, such as routine mammography or colonoscopy exams (among other routine screening exams). Mr. Quindoza will contrast routine screening tests expressly covered under statute from genetic testing billed in this case, which is not generally eligible for reimbursement by Medicare on the basis that such testing is not reasonable and not necessary.

- Mr. Quindoza will discuss and explain that Medicare publishes guidance regarding what services it does and does not cover in a variety of publications, including National Coverage Determinations ("NCDs") and Local Coverage Determinations ("LCDs"). Mr. Quindoza will discuss the applicable NCDs and LCDs published in the relevant Medicare

6

Administrative Contractor ("MAC") geographic jurisdictions, during the charged conspiracy.

- Even if a genetic test satisfies the applicable statutory and regulatory requirements above, the test must also satisfy applicable LCD coverage limitations. Mr. Quindoza will discuss the LCDs issued by the MACs for the relevant Medicare jurisdictions and their respective limitations of coverage of specific genetic tests as well as billing trends associated with the publication and implementation of certain LCDs and NCDs.

- Mr. Quindoza will also explain Medicare's rules related to providers' record-keeping requirements and requirements related to documenting medical necessity in the patient record. Specifically, Mr. Quindoza will explain that Medicare requires ordering/referring physicians to document medical necessity and other coverage for genetic testing. Medicare regulations require health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.

### 7. Medicare's Coverage for DME

- Mr. Quindoza will testify that this case implicates claims submitted to Medicare Part B for DME, namely, various types of orthotic braces.

- Mr. Quindoza will explain Medicare's reimbursement policies with respect to such DME, and he will testify that Medicare reimburses for these products at varying rates, typically several hundred dollars per brace or more depending on the type of brace.

- Mr. Quindoza will explain that Medicare Part B does not pay for every potential medical service, and, instead, many services are expressly excluded from coverage.

- Mr. Quindoza will testify that as a condition of Medicare payment, a physician or other Medicare provider must certify that the services provided were medically necessary, as required by Title 42, United States Code, Section 1395n(a)(2)(B). Medicare expressly excludes from coverage any items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 C.F.R. § 411.15(a)(1); 42 C.F.R. § 410.10(g)-(h).

- Mr. Quindoza will further explain that Medicare does not cover DME unless there is a written order from a licensed clinical professional prescribing the DME. The prescription must have resulted from a face-to-face encounter between the prescriber and the beneficiary, and the encounter must be used for the purpose of diagnosing, treating, or managing a clinical condition for which the DME is ordered. The face-to-face encounter can be a telehealth encounter, if the telehealth encounter meets the requirements described above. The prescription for the DME must be supported by medical records by the prescriber.

- Mr. Quindoza will explain that Medicare would not cover claims if it knew that the claims were based on kickbacks or bribes.

- Mr. Quindoza may discuss additional guidance, including coverage determinations and articles, issued by CMS that govern coverage for DME.

## 8. Billing in This Case

- Mr. Quindoza will apply his knowledge of Medicare rules and regulations regarding claims and reimbursement for genetic testing and DME to the facts of this case.

- Mr. Quindoza will answer hypothetical questions drawn from the facts of this case regarding how Medicare coverage guidelines are applied in different scenarios.

- Mr. Quindoza may testify regarding summary exhibits explaining billing data and billing patterns in this case.

- Mr. Quindoza may quantify and summarize the amounts billed and paid for various types of testing by the laboratories and DME provided by the DME companies referenced in the Indictment—for particular beneficiaries, as well as by the top referring providers.

- Mr. Quindoza may convey specific claims information for the claims charged as substantive health care fraud counts in the Indictment, such as the claim number, date of service, billing date, amount billed, procedure codes billed, and associated diagnoses codes reflected in the billing data.  Mr. Quindoza may also explain to the jury additional information about the laboratory and DME providers' billing for the beneficiaries identified in the health care fraud counts beyond the specific claims charged, as well as information about their prior treatment history with the referring physician, as evidenced in claims data produced to the defense.

- Mr. Quindoza may discuss audits that Medicare conducted of the DME Companies at issue in the Indictment.

## 7. Information Relied Upon By Mr. Quindoza

- To date, Mr. Quindoza has been provided the following records by the prosecution team to assist in his review, which have been provided to the defense in this case, in addition to publicly available statutes, regulations, and guidance, some of which is referenced herein:

  o Medicare enrollment records for the laboratories and DME companies referenced in the Indictment in this case;
  o The Indictment in this case;

8

o Part B billing data for the laboratories and DME companies referenced in the Indictment in this case and related to the Indictment in this case.

**Laurie McMillan:**   The United States intends to call Laurie McMillan to provide additional testimony regarding the Medicare program, which will build on, but not duplicate, Mr. Quindoza's anticipated testimony.

Qualifications:  Laurie McMillan currently works as the Director of Healthcare Payment Integrity Policy with Advize Health, LLC.  From 2014 to 2021, Ms. McMillan was the Law Enforcement Coordinator and Project Manager for Medicare's Unified Program Integrity Contractor ("UPIC") governing Florida and other states.  In this role, Ms. McMillan coordinated medical reviews requested by law enforcement; collaborated with federal and state agencies to provide information on coding guidelines, Medicare rules and regulations, and indicators of fraud from clinical documentation and billing data; and provided fact and expert testimony in federal criminal prosecutions.  Ms. McMillan has been qualified in federal court as an expert witness. Prior to her work for the UPIC, Ms. McMillan worked for several years for various Medicare Administrative Contractors.  Ms. McMillan was in active duty for the United States Air Force's Nurse Corps from 1985-1988 and worked in the medical field as a nurse for over two decades. She is a Registered Nurse, a Certified Fraud Examiner, and a Certified Professional Coder.  Ms. McMillan obtained her Bachelor of Science in Nursing from the University of Nebraska.  A copy of Ms. McMillan's CV has been produced to the defense.

Bases for Testimony:  In the course of her many years in this industry, Ms. McMillan has become familiar with Medicare's coverage for laboratory testing services and has overseen numerous fraud investigations for Medicare contractors.  She has testified about Medicare's rules and regulations dozens of times.  Ms. McMillan is also familiar with the billing and procedure codes applicable to different forms of laboratory testing, including different forms of genetic

testing.  Ms. McMillan's testimony is based upon her training, knowledge, skill, and experience in the area of Medicare.  In addition, Ms. McMillan will be provided with Part B billing data for the laboratories referenced in the Indictment to assist in her review.

Summary of Anticipated Testimony:  The United States anticipates that Ms. McMillan's testimony will build on Stephen Quindoza's anticipated testimony regarding Medicare's coverage of various laboratory testing services, including genetic testing.  Specifically, Ms. McMillan will describe the billing codes (known as Current Procedural Terminology or "CPT" codes) used to bill for CGx and cardio testing.  Ms. McMillan will describe the services that are supposed to be provided when various CPT codes are billed by a laboratory.

To date, Ms. McMillan is being provided the Part B billing data for the laboratories referenced in the Indictment and the Medicare enrollment forms for those laboratories.  Ms. McMillan will review the billing data, including the CPT codes commonly used.  Based on her review, Ms. McMillan will categorize the genetic testing CPT codes and determine which CPT codes correspond to CGx and cardio tests.  Ms. McMillan may create charts presenting this information, which will be disclosed to the defense.  Ms. McMillan may also create or review additional summary charts during the course of trial preparation, which will be disclosed to the defense.

**Medical Experts in CGx and Cardio Genetic Testing**

**Dr. Anthony Magliocco (CGx Testing)**:  The United States intends to call Dr. Anthony Magliocco, or another expert, to testify regarding cancer, the nature of CGx tests, and the medically appropriate and inappropriate uses of these tests.

Qualifications:  The United States has provided Dr. Magliocco's CV to the defense and transcripts of his prior testimony.  In sum, Dr. Magliocco has a medical degree from the University

of Alberta and is licensed in the state of Florida.  He specializes in pathology and laboratory medicine and is the CEO and President of Protean BioDiagnostics, which is a medical lab focused on precision medicine for cancer patients.  This facility provides comprehensive testing services for cancer doctors including cancer genetic testing services.  This is a CAP CLIA licensed laboratory.  The mission is to make high quality cancer testing available to all patients for whom it is appropriate regardless of where they live to accelerate precision medicine especially in underserviced areas and in disadvantaged patients.

Prior to founding this company, Dr. Magliocco held multiple positions at the Moffitt Cancer Center, including serving as chairman of the anatomic pathology department, scientific director of the tissue core (one of the largest tumor banks in the world), director of multiple fellowship training programs, and the principal investigator of a laboratory that hosted a research program at Moffitt.  Dr. Magliocco has served as an associate professor or professor of oncology and of pathology at four universities (Saskatchewan, Calgary, USF, and UCF).  He has published over 200 articles on cancer research.  He founded the Hereditary Cancer Program in Saskatchewan and received special recognition from the Canadian Cancer Society to support this project.  Dr. Magliocco has extensive experience treating patients with cancer, including interpreting the results of CGx tests, using these tests in treating patients, and consulting patients about CGx testing.  As a result of these and other experiences, Dr. Magliocco has become familiar with CGx testing, including the purposes of these tests, the clinical uses of the tests, the medically appropriate and inappropriate uses of these tests.  Dr. Magliocco has previously testified as an expert in CGx testing in *United States v. Scott*, 19-cr-00209-PGB, and *United States v. Rao*, 19-cr-00507-L (N.D. Tex.).

Bases for Testimony:  As a result of his extensive experience, Dr. Magliocco has become familiar with CGx testing, including the purposes of these tests, the clinical uses of the tests and the medically appropriate and inappropriate uses of these tests.

Summary of Anticipated Expert Testimony:   The United States anticipates that Dr. Magliocco's testimony will cover the following topics and include the following opinions:

**1.  Background on Cancer and CGx Testing**

- Dr. Magliocco will explain what cancer is.  He will testify that cancer is an abnormal growth of the body's cells that can invade local tissue and disrupt the function of those tissues.  Cancer can spread to other organs and cause death.

- Dr. Magliocco will explain what CGx testing is.  Namely, CGx testing is a process of measuring the genetic information within the cells to determine if the genetic information is correct or has errors (*i.e.*, mutations) in it.  Such errors can be inherited or they can be acquired.

- Some families are cancer-prone and certain genes or mutations can determine the risk of an individual acquiring cancer throughout their lifetime.  Genetic testing can determine if a patient is at higher risk of developing cancer and is often used in younger individuals to determine if they have inherited a high risk of cancer from their family members.  CGx testing can also be used in people who have cancer to determine the best course of treatment.

- As a general matter, it is not appropriate to use these tests for curiosity.  Instead, the tests should be used for a medical decision-making purpose.  Thus, it is essential that the tests be ordered by a medical professional who is actually treating the patient and uses the results in the patient's treatment.

**2.  Medically Appropriate & Inappropriate Uses of CGx Tests**

- In a patient where an inherited cancer syndrome is suspected, a CGx test may be indicated as a tool to assist treating physicians, gather information, discuss treatment options and assist patients with making informed decisions about their care.  CGx testing should only be ordered to compliment a complete care program managed by one or more physicians or appropriately trained health care providers with the expertise to treat the patient.  Managed by a physician treating these patients, the information obtained from CGx testing can play a meaningful role in providing quality care.

- Dr. Magliocco will also testify that there is currently little or no evidence that use of CGx testing that broadly targets the general population, and especially the elderly, has any

clinical value.   Such broad-targeted campaigns are not currently endorsed by the Association of Molecular Pathology (AMP), of which Dr. Magliocco is a member.

- Age plays a role in determining whether or not a CGx test is medically appropriate.  Genetic testing in younger people provides a window of opportunity to modify the person's risk of developing cancer.  As a person ages, the ability to modify that risk diminishes.

- Dr. Magliocco will answer hypothetical questions, including hypothetical questions drawn from the facts of this case, to further explain what would be, in his opinion, medically appropriate and inappropriate uses of these tests.

- Dr. Magliocco will contrast CGx testing from other forms of tests which are diagnostic in nature designed to identify the existence of malignancy, such as colonoscopies, PAP smears, and mammograms.   Unlike these tests, CGx testing is not designed to be diagnostic, but rather to identify whether a person has an increased risk for development of certain inherited cancer syndromes.  Dr. Magliocco will testify that inherited cancer syndromes are different from cancers that are not genetic in origin, and that they are in fact quite rare.   Dr. Magliocco will explain that CGx testing, unlike other commercially-available forms of genetic testing that are typically delivered to patients on a self-pay and direct to consumer basis, is not currently indicated for general use because the risks of such testing vastly outweigh the benefits.

- Results of a CGx test must be thoroughly explained to the patient by a qualified medical professional and the results must be utilized in determining further treatment for the patient.  CGx testing results are complex and can be inconclusive in nature such that they require the skills of a properly trained physician or other properly trained and certified health care providers to accurately interpret them in a manner that is useful to the patient.  Absent involvement by a competent treating physician, there is unreasonable risk that patients could misinterpret CGx testing results which could lead them to make premature and unwarranted medical decisions, or conversely to take an apathetic approach to their health based upon a false sense of security.  Information revealed by CGx testing can also exact psychological tolls on patients absent proper management by a trained physician.

- Dr. Magliocco will explain that CGx testing results can also be misleading.  For example, a negative result does not mean that a particular patient will not develop cancer, nor does it mean that the patient has a reduced overall risk for the future development of cancer during the course of his or her lifetime (approximately 1 in 3 chance).   Absent comprehensive genetic counseling, a patient could misinterpret a negative test result to their future detriment.

- If the results of a CGx test are not explained to the patient and are not utilized in the patient's treatment, that is the equivalent of not rendering the service at all and also indicates that the test was medically unnecessary.

- Dr. Magliocco will testify that the potential benefits of CGx testing outweigh the risks and is medically indicated in a limited number of high-risk patients such as those with a current

diagnosis of cancer or those patients having multiple immediate family members with suspected inherited cancer syndrome. Suggestive inherited cancer syndrome means multiple members of a family, more than one generation, cancer at a young age (i.e., less than 50) and multiple cancers in a single individual (i.e., breast and ovarian cancer in a woman). Cancer-free patients having a single relative with a vague history of cancer does not qualify as suggestive inherited cancer syndrome or familial cancer syndrome.

- Dr. Magliocco will testify that when a treating physician decides that it is in his or her patient's best interest to receive CGx testing and subsequently orders it, the testing should be accompanied by comprehensive pre- and post-testing genetic counseling provided by a genetic counselor, physician, or health care provider with appropriate training and experience in the area of genetics. Genetic counseling is a service provided by a properly credentialed medical provider who helps to explain the purpose of a genetic test, how the test will be done, what the results will look like, what different results might mean, and what the implications of those results might be in terms of how they might affect treatment of a current cancer. If screening or risk modification strategies are available, genetic counseling is also useful to explain to patients implications related to insurance reimbursement, as well as what impacts if any, CGx testing results might have on other immediate family members, especially children.

- Dr. Magliocco will testify that, as a treating physician, he is familiar with the importance of thoroughly documenting his patients' medical charts. Dr. Magliocco will testify that the purpose of a medical chart is to document the patient encounter, record the information reviewed and document a future plan of care for the patient. Proper charting is vital to continued care of patients because health care providers see patients in episodes over a short period of time. When it comes to CGx testing, patients' medical charting should thoroughly document the bases for ordering CGx testing, which CGx test was deployed, as well as contain information about how the decision to conduct genetic testing fits into the referring physician's treatment plan for the patient.

- Dr. Magliocco will testify that it is inappropriate and potentially dangerous for a physician to give away his or her signature. A physician's signature signifies that the physician has evaluated whether the prescribed treatment is appropriate for the patient. While there is a place for standing orders for certain types of routine and basic testing, it is not appropriate or a physician to give away his or her signature to prescribe CGx tests when the physician is not evaluating or making a determination as to whether the test is appropriate for the patient.

### 3. Specific Opinions about CGx Testing in this Case

- Dr. Magliocco may also review documents produced to the defense and offer opinions on those documents based on his extensive relevant training and experience as described in Dr. Magliocco's CV (provided to the defense along with this notice).

- For example, Dr. Magliocco may offer opinions on the testing purportedly conducted on specific patients in this case, including opinions regarding whether testing of specific

patients was medically appropriate, based on his experience and the principles discussed herein.

- Dr. Magliocco may also create or refer to summary exhibits.

   **4.  Information Provided to Dr. Magliocco**

- The United States intends to provide Dr. Magliocco with the following information to assist in his review:

   o   The Indictment in this case; and
   o   Requisitions and chart notes for certain other beneficiaries.

- The United States anticipates providing Dr. Magliocco with additional requisitions and patient charts, as well as summary exhibits of trends in the relevant laboratories' billing data, over the course of trial preparation and will supplement these disclosures on a rolling basis.


   **Dr. Rajat Deo (Cardio Genetic Testing):** The United States intends to call Dr. Rajat Deo, or another expert, to testify regarding cardiac illness, the nature of cardio genetic tests, and the medically appropriate and medically inappropriate uses of these tests.

   Qualifications:  The United States has provided Dr. Deo's CV to the defense. In sum, Dr. Deo holds an S.B. from MIT, an M.D from the University of Michigan Medical School, and a Masters of Science in Translational Research from the University of Pennsylvania School of Medicine.  Currently, Dr. Deo serves as the Director of the Penn Arrhythmia Genetics Program at the University of Pennsylvania, where he has also served as a Cardiologist for the Department of Athletics since 2013.  Dr. Deo is board certified in Internal Medicine, Cardiovascular Disease, and Clinical Cardiac Electrophysiology.  He is licensed in California, Maryland, and Pennsylvania. Dr. Deo is a member of multiple professional and scientific societies, and has held editorial positions for numerous medical journals, including serving as a reviewer for the American Journal of Cardiology since 2006.  Dr. Deo has held multiple academic appointments and lectured on cardiology issues multiple times.  Dr. Deo has authored dozens of publications on cardiology,

including publications pertaining to cardio genetic testing.  Dr. Deo has not previously testified as an expert regarding cardio genetic testing.

 Bases for Testimony:  As a result of his extensive experience, Dr. Deo has become familiar with cardio testing, including the purposes of these tests, the clinical uses of the tests and the medically appropriate and inappropriate uses of these tests.

Summary of Anticipated Expert Testimony:  The United States anticipates that Dr. Deo's testimony will cover the following topics and include the following opinions:

**1.   Background on Cardiac Disease and Cardio Genetic Testing**

- Dr. Deo will explain what cardiac diseases are and what cardio genetic testing is.  Namely, cardio genetic testing looks for genes or genetic mutations associated with certain inherited cardiac diseases.

  As a general matter, it is not appropriate to use these tests as a routine screening tool in the general population.  Instead, the tests should be used for a medical decision-making purpose.  Thus, it is essential that the tests be ordered by a medical professional who is actually treating the patient and uses the results in the patient's treatment, and a professional who can appropriately counsel the patient about the benefits and risks of these tests.

**2.   Medically Appropriate & Inappropriate Uses of Cardio Genetic Tests**

- In a patient where an inherited cardiac syndrome is suspected, a cardio genetic test may be indicated as a tool to assist treating physicians, gather information, discuss treatment options and assist patients with making informed decisions about their care. Cardio genetic testing should only be ordered to compliment a complete care program managed by one or more physicians or appropriately trained health care providers with the expertise to treat the patient.  Managed by a physician treating these patients, the information obtained from cardio genetic testing can play a meaningful role in providing quality care.  It can also assist family members in determining whether they are likely to have a gene or mutation associated with an inherited cardiac disease, and therefore assist in early treatment or risk management.

- A primary care physician or other non-specialist physician should not normally order cardio genetic testing; instead, such testing is typically ordered after referral to a specialist.

- Cardio genetic testing typically should not be the first step in managing a patient's cardiac-related illness, particularly for a patient with no diagnosed first-degree familial cardiac genetic mutation. Cardio genetic testing should be used on a highly selective patient

16

population.  Patients whose sole diagnosis is essential hypertension or chronic ischemic heart disease generally should not receive cardio genetic testing as a matter of routine treatment.

- Dr. Deo will answer hypothetical questions, including hypothetical questions drawn from the facts of this case, to further explain what would be, in his opinion, medically appropriate and inappropriate uses of these tests.

- Dr. Deo will contrast cardio genetic testing from other forms of tests which are diagnostic in nature designed to identify the existence of cardiac disease, such as for example, electrocardiograms, echocardiograms, stress tests, cardiac catheterization, CT scans, cardiac MRIs.  Common cardiac diseases such as essential hypertension or chronic ischemic heart disease generally should be evaluated through routine imaging in the first instance.

- Cardio genetic testing results are frequently complex and inconclusive in nature such that they require the skills of a properly trained physician or other properly trained and certified health care providers to accurately interpret them in a manner that is useful to the patient. Absent involvement by a competent treating physician, there is unreasonable risk that patients could misinterpret cardio genetic testing results which could lead them to make premature and unwarranted medical decisions, or conversely to take an apathetic approach to their health based upon a false sense of security.  Information revealed by cardio testing can also exact psychological tolls on patients absent proper management, including pre- and post-testing genetic counseling, by a trained professional.

- Dr. Deo will explain that cardio testing results can also be misleading.  For example, a negative result does not mean that a particular patient will not develop cardiac disease, nor does it mean that the patient has a reduced overall risk for the future development of cardiac disease during the course of his or her lifetime.  Absent comprehensive genetic counseling, a patient could misinterpret a negative test result to their future detriment.

- Dr. Deo will testify that the potential benefits of cardio genetic testing outweigh risks and that such testing is medically indicated in a limited number of high-risk patients such as those with a first-degree family member who has a known diagnosis of an inherited cardiac disease.  Patients having relatives with a vague history of cardiac disease do not qualify as suggestive inherited cardiac syndrome; indeed, some form of cardiac disease is quite common in the general population but does not by itself necessarily warrant cardio genetic testing.  In addition, patients with certain unique clinical presentations, such as a very young patient experiencing cardiac arrest, are referred to sub-specialty care and may also warrant cardio genetic testing.

- Dr. Deo will testify that, when a treating physician decides that it is in his or her patient's best interest to receive cardio genetic testing and subsequently orders it, the testing should be accompanied by comprehensive pre- and post-testing genetic counseling provided by a genetic counselor, physician, or health care provider with appropriate training and experience in the area of genetics.  Genetic counseling is a service provided by a properly

17

credentialed medical provider who helps to explain the purpose of a genetic test, how the test will be done, what the results will look like, what different results might mean, and what the implications of those results might be in terms of how they might affect treatment. Genetic counseling is also useful to explain to patients what impacts if any, cardio genetic testing results might have on other immediate family members, especially children.

- Dr. Deo will testify that, as a treating physician, he is familiar with the importance of thoroughly documenting patients' medical charts. Dr. Deo will testify that the purpose of a medical chart is to document the patient encounter, record the information reviewed and document a future plan of care for the patient. Proper charting is vital to continued care of patients because health care providers see patients in episodes over a short period of time. When it comes to cardio genetic testing, patients' medical charting should thoroughly document the bases for ordering cardio genetic testing, which cardio genetic test was deployed, as well as contain information about how the decision to conduct genetic testing fits into the referring physician's treatment plan for the patient.

### 3. Specific Opinions about Cardio Genetic Testing in this Case

- Dr. Deo may also review documents produced to the defense and offer opinions on those documents based on his extensive relevant training and experience as described in Dr. Deo's CV (provided to the defense along with this notice).

- For example, Dr. Deo may offer opinions on the testing purportedly conducted on specific patients in this case, including opinions regarding whether testing of specific patients was medically appropriate, based on his experience and the principles discussed herein.

- Dr. Deo may also create or refer to summary exhibits.


### The Proposed Experts' Testimony Will Be Helpful to the Jury, And They Should Be Admitted As Experts Without Any *Daubert* Hearing

The issues of what constitutes proper genetic testing, particularly the circumstances in which such testing is medically appropriate, the complex nature of these tests, the risks of these tests, the need to properly document patient charts when ordering these tests, and the need to properly explain and integrate the results of these test into patient care, are integral to the fraud alleged in the Indictment. What these genetic tests are, and what constitutes proper uses of these tests, are not common knowledge.

Drs. Magliocco and Deo will provide the jury with an outline of how these tests are supposed to be used. They will also identify indications of possible fraud in the documentation they review in connection with this case. With this testimony as a road-map, combined with the United States' fact witnesses, the jury will have the proper context to determine whether testing was medically appropriate, the red flags the defendants would have been aware of when billing for these tests, and whether Medicare was defrauded. Drs. Magliocco and Deo will thus provide (a) a baseline understanding from which the jury can judge for themselves whether the defendants committed health care fraud and wire fraud as charged in the Indictment, and (b) specific examples of such fraud for the jury to evaluate as well.

Likewise, without Mr. Quindoza's explanation of Medicare's coverage of laboratory testing and DME, as well as the representations that laboratory and DME company owners make to Medicare, the jury will not be able to evaluate whether the tests and DME in this case were fraudulently billed to Medicare. Medicare coverage is governed by a set of laws, regulations, and policies. The jury must understand how Medicare works, how Medicare evaluates claims, and the responsibilities that providers agree to take on in order to assess the conduct at issue in this case. Indeed, much of Mr. Quindoza's proposed testimony covers the allegations in the Background section of the Indictment. A program witness who is deeply familiar with these materials, as Mr. Quindoza is, can both assist the jury in understanding this background and streamline the presentation of background material to the jury. As such, Mr. Quindoza has testified to these and related topics many times, including as an expert witness. In addition, the alleged conspiracy encompasses fraudulent bills submitted by several laboratories and DME companies over the course of years. This amounts to tens of millions of dollars in billing, and thousands of distinct claims. It would be virtually impossible to present each claim to the jury and expect the jury to

identify patterns and trends in the billing. Mr. Quindoza's extensive experience reviewing and analyzing claims will assist the jury in processing the voluminous data that will be presented in this case. Mr. Quindoza will create summary exhibits that assist the jury in understanding what the claims show and what patterns and trends exist. Mr. Quindoza can also opine on the significance of trends in the data based on his experience reviewing claims, investigating fraud, and analyzing large volumes of claims. In this regard, Mr. Quindoza's testimony and summary exhibits will also streamline the presentation of voluminous evidence in this case. Mr. Quindoza has been qualified as an expert in multiple Medicare fraud cases throughout the Eleventh Circuit,[2] and has testified regarding Medicare and even coverage for laboratory testing and DME in other federal trials.

For similar reasons, Ms. McMillan's explanation of CPT codes used in this case will be necessary for the jury to understand and distinguish between different types of services billed in this case.

The United States is aware of another Medicare fraud case involving genetic testing that has gone to trial. In that case, *United States v. Ivan Scott*, 19-cr-00209-PGB, both Dr. Magliocco and Mr. Quindoza were admitted as experts, without objection from the defense. In *Scott*, which involved allegations of health care fraud pertaining to CGx, among other genetic testing, that was billed to Medicare, Dr. Magliocco and Mr. Quindoza testified to nearly identical issues as will be covered in their testimony in this case. The United States has disclosed the transcripts of Dr. Magliocco and Mr. Quindoza's testimony in these cases to the defense. In another criminal genetic testing case that went to trial, *United States v. Sekhar Rao*, 19-cr-00507-L (N.D. Tex.), Dr.

---

[2]       *See, e.g.*, *United States v. Ivan Scott*, 19-cr-00209-PGB (M.D. Fla.); *United States v. Diaz*, 18-cr-20473-COOKE (S.D. Fla.).

Magliocco testified to nearly identical topics concerning the nature of CGx testing. This transcript has also been disclosed to the defense. There, TRICARE, not Medicare, was defrauded, so a program witness familiar with TRICARE testified to topics comparable to Mr. Quindoza's proposed testimony here.

While the United States has attempted to make this Expert Disclosure as complete as possible, the United States notes that it may further supplement this disclosure to address discrete issues that may present themselves in preparing for trial. The United States submits that any additional disclosures will assist the defense in being further prepared for trial, particularly in light of the demands of trial preparation in this complex and document-heavy case.

## **DISCLOSURE OF OTHER TESTIMONY AND EVIDENCE**

The United States may call the following individuals as witnesses to describe and summarize financial transactions at issue in the case or quantify trends in the claims data identified and described by expert witnesses. Furthermore, the United States may call the treating physicians of beneficiaries who (i) received laboratory testing from the laboratories referenced in the Indictment and (ii) received DME from the DME companies referenced in the Indictment, and such physicians would testify about their own treatment of their own patients. Because such medical professionals will discuss treatment of their own patients and their own factual observations, they are not expert witnesses, but lay witnesses. However, in an abundance of caution, and in the interests of full disclosure, the United States provides notice of these witnesses, and the basic subjects of their testimony. Such testimony constitutes lay witness testimony pursuant to Federal Rules of Evidence 601, 602, 701, and does not constitute expert testimony under Rule 702. Nevertheless, the United States hereby notifies defense counsel of such evidence

in case portions of the testimony are objected to as or are later deemed to be within the scope of Federal Rule of Evidence 702.

**Michael Petron:**  The United States will call Michael Petron, CPA, CFE, a Managing Director at Stout Risius Ross, LLC, an investment bank and advisory firm which has contracted with the U.S. Department of Justice, Criminal Division, Fraud Section to conduct financial and billing analysis in this case.[3]  The witness will not be rendering expert opinion, nor medical opinion.  Instead, Mr. Petron will testify about patterns and trends, and explain summary exhibits, regarding otherwise voluminous information contained in the financial records and billing data.

Mr. Petron is a CPA, holds a CFE, a master's degree in accounting, and a master's degree in statistics.  A copy of Mr. Petron's CV was provided to the defense.  Mr. Petron's testimony will discuss certain financial transaction involved in the case and summarize the flow of money in this case, including from Medicare to the laboratories' and DME companies' accounts, and then to various personal and corporate accounts.  This testimony will also cover transactions involved in the health care fraud, wire fraud, kickback and money laundering conspiracies alleged in the Indictment, the specific transactions alleged in the Indictment as overt acts or as substantive kickback and money laundering offenses, and associated records (such as financial and corporate records for the companies involved).  This testimony will include a review of underlying financial and payroll records, examples of similar payments, and the total amounts of payments to laboratories, DME companies, patient recruiters, marketing companies, and telemedicine companies, and the defendants.

---

[3]      Depending on Mr. Petron's availability, the United States reserves the right to call another witness from Stout Risius Ross, LLC, familiar with the financial and billing records in this matter.

Finally, Mr. Petron will summarize bank records and claims data relating to the scheme alleged in the Indictment, to include a review of summary charts prepared by his firm.  Mr. Petron may testify as to observations apparent from these summary charts and other exhibits.

**Primary Care Providers:**    The United States may call primary care providers for some or all of the beneficiaries associated with the laboratory testing and DME charged as substantive health care fraud counts in the Indictment as well as for other beneficiaries.  If the United States calls such primary care providers, they may testify regarding their patients' diagnoses and health issues, and whether the primary care providers have ever prescribed the patients' genetic tests and/or DME and, if not, why not.  Such testimony is factual under Rule 601 and 602.  *See, e.g.*, *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1316 n.23 (11th Cir. 2014) ("A treating physician providing lay testimony can testify narrowly, limited to personal knowledge resulting from providing medical care, involving consultation, examination, or treatment of a potential plaintiff.") (citing *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005)); *see also Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999) ("A treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party."); *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996) (commenting that doctor's lay opinions "were based on his experience as a physician and were clearly helpful to an understanding of his decision making process in the situation.").

## CONCLUSION

WHEREFORE, the United States notices its expert witnesses, provides information about its lay witnesses in the interests of full disclosure, and respectfully requests that its proposed expert witnesses be admitted as expert witnesses, without the need for any formal *Daubert* hearing.

Dated:  October 6, 2022

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By:     *Patrick J. Queenan*
        Patrick J. Queenan
        Trial Attorney
        FL Special Bar No. A5502715
        Reginald Cuyler Jr.
        Trial Attorney
        Florida Bar No. 0114062
        U.S. Department of Justice
        Criminal Division, Fraud Section
        1400 New York Avenue, N.W.
        Washington, D.C. 20005
        Patrick.Queenan@usdoj.gov
        Reginald.Cuyler.Jr@usdoj.gov
        Phone: (202) 875-0326 (Queenan)
        Phone: (202) 748-3024 (Cuyler)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 6, 2022, I caused the above Notice to be filed

electronically via CM/ECF and served on all counsel of record.

*/s/ Patrick J. Queenan*
Patrick J. Queenan
Trial Attorney
U.S. Department of Justice
